**Jeffrey MATHENEY, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2002–SC–0920–MR.

Supreme Court of Kentucky.

March 23, 2006.

As Modified April 4, 2006.

Rehearing Denied June 15, 2006.

Euva D. May, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Gregory C. Fuchs, Assistant Attorney General, Elizabeth A. Heilman, Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice ROACH.

Appellant Jeffrey Matheney was convicted by a Hopkins Circuit Court jury of manufacturing methamphetamine and of being a persistent felony offender in the second degree. He was sentenced to twenty years imprisonment and appeals to this Court as a matter of right. Appellant argues that since he did not possess all the chemicals necessary to manufacture methamphetamine, his conviction must be reversed pursuant to *Kotila v. Commonwealth*, 114 S.W.3d 226 (Ky.2003). We conclude that *Kotila* was wrongfully decided and affirm Appellant's conviction.

## I. *Kotila* Issue

On March 4, 2001 Appellant, accompanied by his wife and children, traveled to Madisonville, Kentucky. In Madisonville, Mrs. Matheney purchased two boxes of cold medicine at the Dollar Store. Appellant then purchased two boxes of cold medicine at the More for Less Store. The family then traveled to an auto parts store and purchased three cans of Pyro (starting fluid) and then went to a hardware store and purchased a gallon of Liquid Fire. They then traveled to another shopping center and purchased two boxes of Su-

dafed. After this purchase, the family traveled to yet another shopping center, where Appellant purchased two more boxes of Sudafed from a Rite Aid drug store. The store manager of this Rite Aid recognized Appellant as the same individual who had bought two boxes of Sudafed three weeks earlier and called the police to report the purchases. A police officer confronted Appellant in the parking lot and ultimately the Matheneys consented to a search of their car. The trunk contained 396 cold and allergy pills containing ephedrine or pseudoephedrine, a gallon of Liquid Fire and three cans of Pyro. Appellant and his wife were arrested.

The evidence at trial established that the following chemicals are necessary to manufacture methamphetamine: (i) ephedrine or pseudoephedrine; (ii) potassium, lithium, or some other reactive metal; (iii) anhydrous ammonia; (iv) ether; (v) acid; and (vi) salt or potassium.[1] Appellant possessed only ephedrine (in the Sudafed and cold pills), acid (Liquid Fire can serve as the requisite acid), and ether (starting fluid contains ether). This case was tried before our decision in *Kotila,* thus the jury was not instructed that Appellant had to possess *all* of the chemicals necessary for the manufacture of methamphetamine. Counsel for Appellant did not object to the instructions, but Appellant claims that the error constitutes palpable error.

From July 15, 1998, when manufacturing methamphetamine was first made a crime in this Commonwealth, until June 20, 2005, KRS 218A.1432(1) simply provided:

A person is guilty of manufacturing methamphetamine when he knowingly and unlawfully:

(a) Manufactures methamphetamine; or

(b) Possesses the chemicals or equipment for the manufacture of methamphetamine with the intent to manufacture methamphetamine.

The General Assembly has now amended KRS 218A.1432(1)(b) to read that a person is guilty of manufacturing methamphetamine when he knowingly and lawfully "(b) with intent to manufacture methamphetamine possesses two (2) or more chemicals or two (2) or more items of equipment for the manufacture of methamphetamine." 2005 Kentucky Laws ch. 150, § 9 (effective June 20, 2005).

In *Kotila v. Commonwealth,* 114 S.W.3d 226 (Ky.2003), this Court held that the version of KRS 218A.1432(1)(b) then in effect required possession of *all* the chemicals or equipment necessary to manufacture methamphetamine. Essentially, this Court found that the statute's use of the word "the" meant that a person could be convicted under subpart (1)(b) of the statute only for possession of *all the* chemicals or equipment (as opposed to "any" or "some" of the chemicals or equipment) for the manufacture of methamphetamine. The *Kotila* majority based this conclusion on grammatical construction and subsequent statutory enactments by the General Assembly. While attempting to discern the General Assembly's intent by analyzing subsequent legislation, the majority opinion conceded that the precise intent of the General Assembly was ambiguous.

The majority also rejected the applicability of criminal attempt under KRS 506.010 unless all the chemicals or equipment necessary to manufacture methamphetamine were present. Justice Keller concurred in the Court's opinion relating to KRS 218A.1432(1)(b). However, he be-

---

**1.** This list of chemicals is consistent with the expert testimony in *Kotila. Kotila,* 114 S.W.3d at 236.

lieved that KRS 506.010 applied to "defendants who intend to manufacture methamphetamine and who undertake 'substantial steps' towards manufacturing methamphetamine by knowingly accumulating materials necessary to do so, but who are apprehended before they can complete the KRS 218A.1432(1)(b) Manufacturing Methamphetamine offense by knowingly possessing all of the chemicals or all of the equipment necessary to manufacture methamphetamine." *Kotila*, 114 S.W.3d at 251 (Keller, J., concurring in part and dissenting in part).

Chief Justice Lambert authored a dissent, which was joined by Justice Wintersheimer. Chief Justice Lambert argued that if the General Assembly had intended the statute to be construed as the majority did, "it would surely have used the word 'all' rather than the more general 'the.' " *Kotila*, 114 S.W.3d at 256 (Lambert, C.J., dissenting). One member of the *Kotila* majority has subsequently admitted that he "was seduced by a metaphysical infatuation which led to an absurdity" and concluded that *Kotila* "does violence to the concept of common sense." *Fulcher v. Commonwealth*, 149 S.W.3d 363, 381 (Ky. 2004) (Graves, J., dissenting).

In *Fulcher*, despite the fact that the defendant possessed a plethora of equipment and chemicals to make methamphetamine, the Court held that since there was no evidence of sodium metal or lithium, the defendant did not possess all the chemicals necessary to manufacture methamphetamine. In addition, since there were no mixing bowls, stirring devices or pliers, the defendant also failed to possess all the equipment necessary to manufacture methamphetamine.

This Court has struggled with the effects of *Kotila* from day one. This is clear from the fact that the bright line rule of *Kotila* survived for only about six months.

In *Varble v. Commonwealth*, 125 S.W.3d 246, 254 (Ky.2004), this Court upheld a conviction under KRS 128A.1432(1)(b) where all the chemicals except anhydrous ammonia and all the equipment except for a filter were present. The Court held that "the odor of anhydrous ammonia" and a "filter of unspecified nature and a dust filter mask" were sufficient evidence to satisfy *Kotila*. *Id.* at 254. Chief Justice Lambert remarked that the holding in *Varble* represented "a significant departure from the bright line rule announced in *Kotila*." Id. at 256 (Lambert, C.J., concurring).

Additionally, with Justice Graves's express disavowal of *Kotila* in his dissent in *Fulcher*, four members of this Court have cast votes that necessarily demonstrate their disagreement with *Kotila's* holding regarding the application of KRS 506.010 (Criminal Attempt) to methamphetamine manufacturing offenses. See *Kotila*, 114 S.W.3d at 249 (Keller, J., concurring in part and dissenting in part); *id.* at 256 (Lambert, C.J., dissenting in part, joined by Wintershiemer, J.); *Fulcher v. Commonwealth*, 149 S.W.3d 363, 381 (Ky.2004) (Graves, J., dissenting).

Since *Kotila* was rendered, over two years ago, it has become increasingly clear that Justice Graves was correct in that requiring possession of *all* the chemicals or equipment to uphold a conviction under KRS 128A.1432(1)(b) defies common sense. And though considerations of stare decisis would normally guide us to adhere to *Kotila*, we simply cannot overlook the fact that the Court's reasoning in subsequent decisions addressing KRS 218A.1432(1)(b) has already departed significantly from the bright-line rule. Therefore, we go one step further and hold that *Kotila's* construction of KRS 218A.1432(1)(b) was incorrect.

■ We do not reverse *Kotila* lightly. As the dissent observes in its extensive discussion, stare decisis is an important guiding principle in American jurisprudence. On that point, we are in complete agreement. However, as this Court has noted recently,

> the doctrine of stare decisis does not commit us to the sanctification of ancient or relatively recent fallacy. While we recognize this Court should decide cases with a respect for precedent, this respect does not require blind imitation of the past or unquestioned acceptance ad infinitum. Rather, in many ways, respect for precedent *demands* proper reconsideration when we find sound legal reasons to question the correctness of our prior analysis.

*Morrow v. Commonwealth,* 77 S.W.3d 558, 559 (Ky.2002) (internal brackets, quotation marks, and footnotes omitted), overruling *Gray v. Commonwealth,* 979 S.W.2d 454 (1998). *Morrow,* like this case, concerned statutory construction of relatively recent vintage.[2] And when we found that construction wanting, we ruled, as we do here, that stare decisis must give way.

■ We construe the language in KRS 218A.1432(1)(b) that states "the chemicals or equipment for the manufacture of methamphetamine" to mean that one must possess two or more chemicals or items of equipment with the intent to manufacture methamphetamine to fall within the statute. This construction is based on a common sense approach that gives proper import to the use of the plural "chemicals." Of course, any conviction must also satisfy the scienter requirement contained in KRS 218A.1432(1)(b). In light of this construction, we need not consider Appellant's argument regarding palpable error, because no error occurred regarding the jury instructions.

■ Appellant also argues that KRS 218A.1432(1)(b) is unconstitutionally void for vagueness. Essentially, Appellant argues that if KRS 218A.1432(1)(b) is interpreted to encompass possession of less than all the chemicals or equipment necessary for the manufacture of methamphetamine, then a citizen is required to guess what combinations would result in a violation of the statute. Appellant overlooks that the statute allows conviction only when an individual possesses the requisite chemicals or equipment *with the intent to manufacture methamphetamine.* This makes certain what conduct is proscribed. "It would be difficult, if not impossible, for a person to inadvertently purposely or knowingly take action in furtherance of the

---

**2.** We note that, although *Morrow* reversed the Court's construction of the statute in question, Justice Cooper nonetheless joined its majority opinion.

Curiously, Justice Cooper's dissent cites to his concurring opinion in *Kentucky Dept. of Corrections v. McCullough,* 123 S.W.3d 130, 141 (Ky.2003), another case involving statutory construction, to demonstrate his fidelity to the doctrine of stare decisis. Justice Cooper's entire concurring opinion in that case reads as follows:

> Despite my continuing belief that *Department of Corrections v. Furr,* Ky., 23 S.W.3d 615 (2000), was wrongly decided, four Justices (including one who joined my dissent in *Furr* ) have reaffirmed it today, albeit *sub*

*silentio.* Accordingly, and mindful of *stare decisis,* I join the opinion of the Court, primarily to ensure that the punitive damages analysis receives a majority vote. *I do so, however, with the hope that in due time a majority of the Court will recognize and correct the error* made in *Furr. See Scott v. Illinois,* 440 U.S. 367, 374–75, 99 S.Ct. 1158, 1162–63, 59 L.Ed.2d 383 (1979) (Powell, J., concurring).

*Id.* at 141 (emphasis in last sentence added). The emphasized language, which the dissent fails to include with its quotation of the rest of the concurrence, demonstrates a willingness to disregard stare decisis, even when a question of statutory construction is involved.

criminal production or manufacture of dangerous drugs." *State v. Leeson,* 319 Mont. 1, 82 P.3d 16, 19 (2003); *see also Kotila,* 114 S.W.3d at 256 (holding that "the additional requirement that the possession be with the intent to manufacture methamphetamine cures any uncertainty as to the nature of the conduct proscribed"). Although in *Leeson* the Supreme Court of Montana was interpreting a statute that listed certain chemicals, *Kotila* correctly dismissed the argument that the statute should be required to list "all of the possible combinations of chemicals and equipment used to manufacture methamphetamine." *Kotila,* 114 S.W.3d at 249. Therefore, we conclude that KRS 218A.1432(1)(b) is not unconstitutionally vague.

## II. Prior Ephedrine Purchase

Appellant also claims he was denied due process when the trial court admitted evidence of a prior ephedrine purchase from the Rite Aid where he made his final ephedrine purchase. The trial court allowed the evidence because it showed why the Rite Aid manager called the police: she had recognized Appellant as a person who had purchased an additional large quantity of cold/allergy pills only a few weeks before. Appellant cites to *Sanborn v. Commonwealth,* 754 S.W.2d 534 (Ky. 1988), for the proposition that this evidence was inadmissible because the Rite Aid manager's action (in calling the police) was not an ultimate issue in the case. *Sanborn,* however, is inapplicable to this case because its rule applies only to whether a potential hearsay statement may be admitted for a non-hearsay purpose, e.g., as a "verbal act." *Sanborn's* basic thrust, in that respect, was to do away with the concept "investigative hearsay" as a means to admit statements made to the police.

■ The evidence that Appellant objected to in this case, however, was not hearsay. Rather, it was the direct testimony from the Rite Aid manager to explain why she called the police. At most, this evidence might raise a KRE 404(b) issue in that it consists of a description of a prior bad act committed by Appellant. And even though Appellant has not raised this ground on appeal, we simply note that the Rite Aid manager's testimony showed Appellant's intent to manufacture methamphetamine, thus it was admissible under the exception in KRE 404(b)(1).

## III. Prosecutorial Misstatement

Appellant next alleges that the prosecutor misstated the law during closing argument. Specifically he claims the prosecutor erred by stating:

> [The General Assembly] put into the statute that people who possess chemicals and/or equipment necessary to manufacture, with intent that those chemicals and equipment be used in manufacture are guilty [of violating KRS 218A.1432(1)(b) ]. Do not fall into the trap, and do not let the defense counsel rewrite the law, to make me have to prove that they themselves were going to do the manufacturing or that I have to prove they were going to manufacture the product themselves. That is not a requirement of the law.

Basically, the prosecutor argued that Appellant did not have to intend to manufacture methamphetamine himself, but only that he intended that the chemicals and equipment in his possession be used in the manufacture of methamphetamine, even if that act was committed by someone else. There was no objection to this statement at trial. Appellant admits that the issue is unpreserved but asks that we review it as palpable error under CR 10.26.

■ We first note that Appellant is correct that the prosecutor technically misstated the law. The language of KRS 218A.1432(1)(b) is clear that the requisite intent is "inten[t] to manufacture methamphetamine," not intent that the chemicals and/or equipment be used (by someone else) in the manufacture of methamphetamine. The prosecutor's description of the law would only be appropriate if Appellant had been prosecuted for *complicity* to manufacturing methamphetamine as allowed by KRS 502.020 or criminal facilitation under KRS 506.080.

■ To support his claim that reversal is required, Appellant points to *Mattingly v. Commonwealth*, 878 S.W.2d 797 (Ky. App.1993),[3] where the Court of Appeals reversed a conviction where during the trial the prosecutor misstated the law of the insanity defense and the defendant had made a "very strong case for insanity." *Id.* at 800. However, a misstatement alone, especially when it is not objected to at trial, does not automatically require reversal.

■■ A claim that the prosecutor misstated the law in closing argument is a claim of prosecutorial misconduct. We follow the approach of the Court of Appeals for the Sixth Circuit when reviewing alleged prosecutorial misconduct, thus

we reverse for prosecutorial misconduct in a closing argument only if the misconduct is "flagrant" *or* if each of the following three conditions is satisfied:

(1) Proof of defendant's guilt is not overwhelming;

(2) Defense counsel objected; and

(3) The trial court failed to cure the error with a sufficient admonishment to the jury.

*Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky.2002) (citing *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir.1994); *United States v. Bess*, 593 F.2d 749, 757 (6th Cir.1979)). Because Appellant did not object at trial, we need only evaluate whether the prosecutor's misstatement was "flagrant."

■ The prosecutor appears to have misstated the law only the one time noted above. During the rest of his closing argument, when he referred to intent, he simply stated that Appellant had to have possessed the chemicals "with intent"— without again defining, correctly or incorrectly, that term. This single misstatement was also mitigated by the fact that the trial court's jury instructions correctly reflected the law in that they required the jury to find that Appellant possessed the chemicals or equipment "with the intent to manufacture." Juries are presumed to follow the instructions of the trial court. *Johnson v. Commonwealth*, 105 S.W.3d 430, 436 (Ky.2003); *see also Scobee v. Donahue*, 291 Ky. 374, 164 S.W.2d 947, 949 (1942) ("It is to be assumed that the jury ... followed the evidence and instructions in their entirety."); *United States v. Davis*, 306 F.3d 398, 416 (6th Cir.2002) ("Juries are presumed to follow the instructions they are given."). And Appellant, whose defense was that he did not have the requisite intent, obviously did not think that the prosecutor's misstatement was flagrant since he did not object at trial. Given that the jury was correctly instructed by the trial court and that the prosecutor backed off from his misstatement of the law as his closing argument proceeded, we cannot say that his misstatement rose to the level of flagrant

---

**3.** Appellant mistakenly claims that *Mattingly* was rendered by this Court. In fact, it was a decision of the Court of Appeals, review of which was denied by this Court.

misconduct.[4]

## IV. School Employee Testimony

Appellant next claims that the prosecutor improperly shifted the burden of proof by introducing nonprobative evidence to impeach his out-of-court statements about why he possessed the cold and allergy pills, when he did not testify at trial. Again, there was no objection at trial, and Appellant now asks us to review the matter for palpable error.

Specifically, Appellant objects to testimony offered about his children's use of cold and allergy pills. When Appellant was arrested, he told the police that he had bought the cold and allergy pills because he and his children have allergies and because he would send the pills to school with his children. This statement was introduced at trial. The school nurse and a guidance counselor at Appellant's children's school testified that it would violate school policy to send the pills to school with the children, that the school had been given no notice of any medical problems, including allergies, of the children, and, most importantly, that the children's teachers would have reported allergy pill use to the nurse but no such report had been made. Appellant argues that this evidence was more prejudicial than probative, showing only that Appellant lied to the police and not that he had intent to manufacture methamphetamine.

Despite Appellant's claim to the contrary, this evidence was offered and was relevant to show his intent. In his reply brief, Appellant states that this goes only to whether he possessed the pills for a lawful purpose, which is not a fact of consequence. But proof that a person does not possess pills containing ephedrine/pseudoephedrine for a claimed lawful purpose is circumstantial evidence that the person possesses those pills for an *unlawful* purpose, namely for manufacturing methamphetamine, which in turn is evidence of intent. As such, introduction of the evidence was not error, much less palpable error.

## V. Medical Testimony

Appellant also raises issue with similar testimony that was introduced to refute his claim that he took the pills for his own allergies. Appellant told the police that he took 12–16 allergy pills per day. This statement was introduced, and the prosecutor then proceeded to refute it with medical testimony that such large, sustained pseudoephedrine consumption would lead to "significant medical problems," including extreme hypertension and an elevated heart rate. Appellant actually objected to this testimony at trial and now claims that its introduction was improper impeachment on a collateral matter.

The law in Kentucky has consistently prohibited impeachment on collateral facts. *See Metcalf v. Commonwealth,* 158 S.W.3d 740, 744 (Ky.2005); *Purcell v. Commonwealth,* 149 S.W.3d 382, 397–98 (Ky.2004); *Neal v. Commonwealth,* 95 S.W.3d 843, 849 (Ky.2003); *Slaven v. Com-*

---

4. We also note that even if Appellant had shown flagrant misconduct, because there was no objection at trial, we would also have to find that Appellant suffered "manifest injustice" before we could grant any relief to which he might have been entitled as to the unpreserved error. CR 10.26. Given that the trial court's instructions properly stated the law as to Appellant's intent and that there was substantial evidence (in the form or possession of a substantial amount of ephedrine/pseudoephedrine and other chemicals used in the manufacturing process, repeated trips to multiple retail stores to buy pills containing ephedrine/pseudoephedrine) of Appellant's intent to manufacture methamphetamine, we simply cannot say that Appellant suffered manifest injustice.

*monwealth,* 962 S.W.2d 845, 858 (Ky.1997). The medical testimony in question, however, was not about collateral facts. Rather, it was circumstantial evidence of Appellant's intended unlawful use of the drugs he had purchased because it showed that he had purchased far more than was medically necessary or even advisable to use. The medical testimony was proper.

For the foregoing reasons, we affirm Appellant's conviction.

LAMBERT, C.J.; GRAVES, SCOTT and WINTERSHEIMER, JJ., concur.

GRAVES, J., also concurs by separate opinion in which SCOTT, J., joins.

COOPER, J., dissents by separate opinion.

JOHNSTONE, J., dissents and would affirm the HOPKINS Circuit Court in accordance with the legal analysis contained in Justice COOPER'S dissenting opinion, but does not join the dicta contained therein.

Concurring opinion of Justice GRAVES.

It is evident that the dissent feels passionately about the issues under consideration. I respect the dissent and have given careful consideration. However, for the reasons previously set forth in my dissenting opinion in *Fulcher v. Commonwealth,* 149 S.W.3d 363, 381–82 (Ky.2004) (Graves, J., dissenting) and consistent with the basic principles of chemistry explained in *Commonwealth v. Hayward,* 49 S.W.3d 674 (Ky.2001), I concur with the majority's sound analysis and well reasoned disposition in this case.

Unyielding polemics and polarizing arguments are not necessary for the presentation of a rational explanation of the legal justification for the change in my vote from *Kotila v. Commonwealth,* 114 S.W.3d 226 (Ky.2003).

I agree with the dissent's learned explanation of the history and importance of the doctrine of *stare decisis.* As the dissent points out, "*stare decisis* [is] the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Ante* at 618–19 (quoting *Vasquez v. Hillery,* 474 U.S. 254, 265–66, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986)). However, the dissent also acknowledges the following historical fact: "American courts never adopted the nineteenth century English rule that precedents are absolutely binding in all circumstances. They instead reserved the right to overrule decisions that were absurd or egregiously incorrect." *Id.* (quoting Thomas Healy, *Stare Decisis as a Constitutional Requirement,* 104 W. Va. L.Rev. 43, 55 (2001)).

In the context of U.S. Supreme Court jurisprudence, Justice Souter has described the doctrine, in its current form, as follows:

> *Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Adhering to precedent 'is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right.' Nevertheless, when governing decisions are unworkable or are badly reasoned, 'this Court has never felt constrained to follow precedent.' *Stare decisis* is not an inexorable command; rather it 'is a principle of policy and not a mechanical formula of adherence to the latest decision.'

*Payne v. Tennessee,* 501 U.S. 808, 827–30, 111 S.Ct. 2597, 2609–11, 115 L.Ed.2d 720 (1991) (Souter, J., joined by Kennedy, J.,

concurring) (citations and quotations omitted). In Kentucky, we have adhered to this prevailing understanding of the doctrine. *See, e.g., Crayton v. Commonwealth,* 846 S.W.2d 684, 689 (Ky.1993) ("it is our duty to continually re-examine our prior decisions to prevent perpetuation of error"); *Corbin Motor Lodge v. Combs,* 740 S.W.2d 944, 946 (Ky.1987) (precedent may be overturned where the need is compelling); *Daniel's Adm'r v. Hoofnel,* 287 Ky. 834, 155 S.W.2d 469, 471 (1941) ("This wholesome rule [*stare decisis*] is not inflexible or so imperative as to require perpetration of error ...."); *McCormack v. Louisville & Nashville R.R.,* 156 Ky. 465, 161 S.W. 518, 520 (1913) ("Upon the principle of *stare decisis,* the decisions which have been rendered by a court will be adhered to by such court in subsequent cases, unless there is something manifestly erroneous therein ....").

Indeed, a brief sampling of our caselaw over a mere two year period reveals no less than seven opinions purporting to overrule precedent previously established by this Court. *See Fletcher v. Commonwealth,* 163 S.W.3d 852, 871 (Ky.2005) (op. by J. Cooper); *Matthews v. Commonwealth,* 163 S.W.3d 11, 26–27 (Ky.2005)(op. by J. Keller); *Commonwealth v. Mobley,* 160 S.W.3d 783, 787 (Ky.2005)(op. by C.J. Lambert); *Stopher v. Conliffe,* 170 S.W.3d 307, 310 (Ky.2005) (op. by J. Keller); *St. Clair v. Commonwealth,* 140 S.W.3d 510, 532, 572 (Ky.2004) (op. of the Court); *Hampton v. Commonwealth,* 133 S.W.3d 438, 442 (Ky.2004) (op. by J. Graves); *Rapier v. Philpot,* 130 S.W.3d 560, 564 (Ky. 2004) (op. by J. Johnstone); *see also, Regenstreif v. Phelps,* 142 S.W.3d 1, 2 (Ky. 2004) (op. by J. Keller)(overruling Court of Appeals precedent); *Messer v. Messer,* 134 S.W.3d 570, 573 (Ky.2004) (op. by J. Cooper) (overruling Court of Appeals precedent).

Mindful of its disfavored status, the majority carefully considered the merits of the case and determined, as this Court has done at least seven times in the past two years, that compelling reasons warranted a reversal of precedent. This was by no means a display of "judicial activism," but rather an obligation to halt the perpetuation of egregious error. In hindsight, it is understandable how such error arose.[1]

Unfortunately, in *Kotila,* the forensic chemist merely described the maladroit process by which clandestine operators manufacture methamphetamine. Subsequent to *Kotila,* my research of the chemical literature[2] revealed that methamphetamine may be manufactured with only two

1. In *General Electric Co. v. Joiner,* Justice Breyer noted the "inherent difficulty" faced by judges when evaluating science-related issues, and the steps that can be taken to help compensate for the judge's "comparative lack of expertise" in the subject area. 522 U.S. 136, 147–50, 118 S.Ct. 512, 520–21, 139 L.Ed.2d 508 (1997) (Breyer,J., concurring) ("[J]udges are not scientists and do not have the scientific training that can facilitate the making of such decisions."). Despite this inherent difficulty, Justice Breyer went on to emphasize, however, that "neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties" that the *Daubert* Rule imposes. *Id.*

2. According to Justice Breyer, some of the steps judges should take in order to compensate for their "comparative lack of expertise" include "increased use of Rule 16's pretrial conference authority to narrow the scientific issues in dispute, pretrial hearings where potential experts are subject to examination by the court, and the appointment of special masters and specially trained law clerks." *Id.* at 149, 118 S.Ct. 512. In this case, my prior training in Chemistry permitted me to review and comprehend the relevant chemical literature pertaining to the disputed issue.

chemicals, namely, a methamphetamine precursor (usually ephedrine or psuedoephedrine) and a chemical reducing agent[3]. The other chemicals mentioned in the testimony of *Kotila* are either catalysts to speed the reaction and other chemical reagents or solvents to remove impurities and byproducts during the synthesis. The auxiliary chemicals convert the crude undistilled methamphetamine which is unsuitable for human consumption into refined methamphetamine which is marketable for human consumption. Upon further examination in subsequent cases, it became obvious that the scientific testimony utilized in *Kotila* was incomplete and that such an inadequate understanding of the essential chemical elements of methamphetamine synthesis resulted in an absurd and unworkable interpretation of the applicable statute.

The decision in *Kotila* is alchemy. The alchemists mixed philosophy and science in the Middle Ages. Modern science has discredited alchemy. We have a duty to accept scientific reality as it is impossible for an opinion of the Court to alter the fixed and immutable principles of chemistry.

On balance, the majority opinion is scientifically and legally justified. It is by no means a coup or usurpation over settled law, as *Kotila's* essential holding existed for a mere six months before it began to be chipped away by subsequent decisions (with this decision coming a mere thirty-two months after *Kotila* was rendered). While I respect the dissent's view that the *Kotila* holding should not be overruled, I wholeheartedly believe that the contrary view taken by the majority is a just and appropriate course within the bounds of proper judicial conduct. I consider it my duty to admit a mistake when the opportunity and circumstances compel remediation. Accordingly, I respectfully concur with the majority opinion.

Scott, J., concurs "heartily" in the burial of *Kotila v. Commonwealth,* 114 S.W.3d 226 Ky.2003). Thirty-one years in the courtrooms of Kentucky have taught me many things, one of which, is "stare decisis" does not command the perpetuation of a wrong decision! And when such a respected jurist as Justice Graves says it's wrong—he's right!

Dissenting opinion by Justice COOPER.

In a startling display of judicial activism, a majority of this Court, without benefit of briefing or oral argument and without either party suggesting that it do so, today overrules *Kotila v. Commonwealth,* 114 S.W.3d 226 (Ky.2003), the established precedent interpreting the 1998 version of KRS 218A.1432(1)(b), and thereby rewrites that criminal statute to substitute its own notion of public policy for that established by the General Assembly. In the thirty months since it was decided, we have followed *Kotila's* construction of former KRS 218A.1432(1)(b) or cited it as controlling authority in eight published opinions and one unpublished opinion, and the Court of Appeals has done so in one published opinion and ten unpublished opinions. The majority's only apparent reasons for departing from the well-established doctrine of *stare decisis* is that one Member of this Court has changed his mind (though the holding in *Kotila* was largely premised upon a previous opinion written by that Member), and that two new Members of the Court would not have joined the *Kotila* majority had they been

---

**3.** *The Merck Index,* Thirteenth Edition, § 5975 at 1063 (2001) [...Can be prepd by reducing ephedrine or pseudoephedrine: Emde. *Helv. Chim.* Acta 12, 365 (1929) ....]; Uncle Fester, *Secrets of Methamphetamine Manufacture,* Chap. 15, p. 109 (6th Ed.2002). (Uncle Fester is a pseudonym for this underground publication by Loompanics Unlimited.)

Members when it was decided. Also disturbing is the majority opinion's portrayal of this Court as a collection of indecisive individual judges rather than as a collegial body. While some Members of the Court have occasionally expressed reservations about various aspects of *Kotila*, as various Members often do with respect to opinions with which they disagree, a collegial Court speaks through its majority opinions and those opinions have consistently followed *Kotila*—until today.

In this dissenting opinion, I will address (1) why today's majority opinion violates principles of statutory construction; (2) why it violates the doctrine of *stare decisis*; (3) why its new interpretation of former KRS 218A.1432(1)(b) renders the statute void for vagueness; and (4) why the General Assembly's 2005 amendment of the statute does not affect our interpretation of the 1998 enactment.

## I. STATUTORY CONSTRUCTION.

KRS 218A.1432(1), as enacted in 1998, provided:

A person is guilty of manufacturing methamphetamine when he knowingly and unlawfully:

(a) Manufactures methamphetamine; or

(b) Possesses the chemicals or equipment for the manufacture of methamphetamine with the intent to manufacture methamphetamine.

1998 Ky. Acts, ch. 606, § 59. This is the version of the statute that existed at the time of Appellant's arrest and conviction. It is subsection (b) that was at issue in *Kotila* and that is at issue in this case. *Kotila* addressed, *inter alia*, whether "*the* chemicals or equipment" (emphasis added) meant "any (*i.e.*, two or more) chemicals or equipment" or "all of the chemicals or equipment" necessary to manufacture methamphetamine.

As noted in *Kotila*, 114 S.W.3d at 235, our first encounter with the offense of manufacturing methamphetamine had been under a previous statutory scheme that defined the offense of trafficking in a controlled substance by manufacture, *inter alia*, as possession of an immediate precursor of a controlled substance with the intent to convert it into a controlled substance. KRS 218A.010(3), (9), (11), (24) (pre–1998 version); *Commonwealth v. Hayward*, 49 S.W.3d 674, 674–75 (Ky. 2001). We held in *Hayward* that under that statutory scheme, "[p]ossessing the primary precursor . . . , ephedrine or pseudoephedrine, *along with all the other necessary chemicals* for the manufacture of methamphetamine provided a legally sufficient basis for the jury to find that Appellant was trafficking in methamphetamine." *Id.* at 677 (emphasis added). If, in fact, the Member of this Court who has changed his mind about *Kotila* "was seduced by a metaphysical infatuation which led to an absurdity," *ante*, at 603, then it was a self-seduction, because that very same Member (Justice Graves) was the author of *Hayward*.[1]

---

1. In his separate concurring opinion in this case, Justice Graves does not so much disagree with the *Kotila* requirement of "all of the chemicals, etc.," as with the expert in *Kotila* who testified that the manufacture of methamphetamine requires more than just two chemicals. Justice Graves now reports in his concurring opinion, *ante*, at 609–10, that he has consulted "chemical literature," specifically *The Merck Index* § 5975, at 1063

(13th ed.2001), and Uncle Fester, *Secrets of Methamphetamine Manufacture* (Loompanics Unitd. 6th ed.2002), and determined that "methamphetamine may be manufactured with only two chemicals, namely, a methamphetamine precursor (usually ephedrine or pseudoephedrine) and a chemical reducing agent." *Ante*, at 609–10. Having reviewed the same literature, I find that (1) *The Merck Index* § 5975 reports that methamphetamine

Following *Hayward* and the first rule of statutory construction, *i.e.*, "the language of the statute itself," *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 338–39 (6th Cir.2000), *Kotila* then applied an elementary principle of English grammar: The word "the" is "[u]sed as a function word before a plural noun denoting a group to indicate reference to the group as a whole." *Kotila*, 114 S.W.3d at 237 (quoting *Webster's Third New Int'l Dictionary of the English Lang. Unabridged* 2369 (1993)). Noting that KRS 446.080(4) directs us to construe our statutes "according to the common and approved usage of language," we then concluded that "the chemicals or equipment" meant "all of the chemicals or all of the equipment necessary to manufacture methamphetamine." *Id.* Unlike today's majority opinion, *Kotila* was not hastily decided; it was the culmination of a year of draft opinions and memoranda, including one opinion that was actually rendered, then withdrawn on petition for rehearing. It was ultimately rendered as an "Opinion of the Court"

---

is a "[c]entral stimulant" that "[c]an be prepd [sic] by reducing [1] ephedrine or pseudoephedrine," by "reducing the condensation product of [2] benzyl [$C_6H_5CH_2$ (univalent radical derived from toluene)] [3] methyl [$CH_3$ (alkyl)] [4] ketone [$R_1(CO)R_2$ (oxidized alcohol)] *and* [5] methylamine [$CH_3NH_2$ (hydrochloric salt)]" (emphasis added) (five chemicals); and (2) Uncle Fester (Justice Graves was gracious enough to direct me to copy of this "chemical literature") describes the manufacture of methamphetamine by the ephedrine reduction or "Nazi" method almost exactly as it was described in the Drug Enforcement Agency (DEA) videotape discussed in *Fulcher v. Commonwealth*, 149 S.W.3d 363, 368 (Ky.2004), except that Uncle Fester refers to this method as the "lithium metal in liquid ammonia reduction" method. As described by Uncle Fester, manufacturing methamphetamine by this method requires (1) ephedrine or pseudoephedrine, (2) anhydrous ammonia, (3) lithium, (4) toluene or mineral spirits (*e.g.*, Coleman camping fuel), (5) ether, and (6) salt. Uncle Fester, *supra*, at 122–27. But even if that were not so, I would accept the DEA's opinion over that of Uncle Fester (whoever he may be), especially since the DEA's opinion was introduced at trial in *Fulcher*.

Courts decide cases based on evidence produced at trial, not extrajudicially-obtained information that is not common knowledge. *Colley v. Colley*, 460 S.W.2d 821, 824 (Ky. 1970) ("The doctrine of judicial notice is confined to matters of common knowledge. It is restricted to what a judge may properly know in his judicial capacity; a judge is not authorized to make his individual knowledge of *a fact not generally known* the basis of his action." (Emphasis added.)); *Gray v. Commonwealth*, 264 S.W.2d 69, 70–71 (Ky.1954)

("While it may be that the trial judge had information from an undisclosed source . . . , such information does not constitute evidence, nor would the judge be authorized to act upon such information as constituting a fact within his judicial knowledge. . . . To hold otherwise would destroy the very purpose for which our courts are established."); *Riley v. Wallace*, 188 Ky. 471, 222 S.W. 1085, 1086–87 (1920) ("[I]t matters not what is known to the judge if it is not known to him judicially . . . . Judge Wallace did not know, indeed could not know *from the record*, of the alleged falsity of the testimony given by Riley and Bealmear." (Emphasis added.)). The reason for this rule is to provide parties the opportunity to rebut or cross-examine such evidence. KRE 201(e) ("A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.").

If methamphetamine can be manufactured with only two chemicals, that fact is certainly not generally known, as no expert witness has yet expressed that opinion in any of the cases thus far considered by this Court on this subject. Further, whether there are other methods of manufacturing methamphetamine that would require fewer chemicals than the "Nazi" method is irrelevant because the proof necessary in each particular case will vary in accordance with which manufacturing method was being used in that case. Specifically, the Commonwealth's expert witness in this case testified that methamphetamine cannot be manufactured with only the three chemicals possessed by Appellant at the time of his arrest, *i.e.*, pseudoephedrine, drain cleaner (containing sulfuric acid), and automobile starter fluid (containing ether).

because it consisted of sections written in part by four different Members of the Court as it was then comprised, *i.e.*, Chief Justice Lambert and Justices Graves, Keller, and Cooper.

At the time of his arrest, Appellant was in possession of 396 Sudafed pills (containing pseudoephedrine, a methamphetamine precursor), a gallon of household drain cleaner, and three cans of automobile starter fluid. The Commonwealth's expert conceded at trial that these were not all of the chemicals needed to manufacture methamphetamine; and, in its brief to this Court, the Commonwealth conceded that this case is "on all fours with *Kotila*," arguing only that the issue had not been properly preserved for appellate review. Brief for Appellee, at 1. Thus, the Commonwealth has not even suggested that *Kotila* was wrongly decided or that it should be overruled, and "it is hardly for this Court to 'second chair' the [Commonwealth] to alter [its] strategy .... [I]t is clear that a similar dispensation would not be granted a criminal defendant however strong his claim." *Colorado v. Connelly*, 474 U.S. 1050, 1052, 106 S.Ct. 785, 786–87, 88 L.Ed.2d 763 (1986) (Mem. of Brennan, J., in opposition to ordering briefing on an issue not raised by the Government). Here, the Court did not even order briefing on the *Kotila* issue.

However, the Court did order oral argument in this case on two issues: (1) whether Appellant's failure to object to the trial court's instruction on manufacturing methamphetamine was reviewable as palpable error under RCr 10.26; and (2) whether double jeopardy precluded a new trial on the lesser included offense of possession of drug paraphernalia, KRS 218A.500(2), where, as here, the jury was not instructed

on that offense at the original trial.[2] *Cf. Kotila*, 114 S.W.3d at 236 (failure to instruct the jury on a particular offense amounts to a directed verdict of acquittal as to that offense). Following oral argument, a draft opinion was prepared and circulated resolving those and the other issues that were, in fact, actually raised on appeal. It was only after the draft was circulated that a new majority of the Court announced that it would decide the case on an issue never raised, briefed, or argued. Because that majority prefers a different result in this case than is required by the plain language of the statute, it simply rewrites the statute to delete the troublesome word "the" and substitutes the more convenient words "two or more." *Ante*, at 604.

Contrary to the majority opinion's characterization of *Varble v. Commonwealth*, 125 S.W.3d 246 (Ky.2004), *ante*, at 603, that case did not depart in any way from *Kotila*. It simply held that the elements of the offense described in KRS 218A.1432(1)(b), like the elements of any criminal offense, can be proven by circumstantial evidence. *Id.* at 254. Thus, the presence of an odor of anhydrous ammonia emanating from two air tanks and of empty blister packs that had contained 500 Sudafed tablets was circumstantial evidence that Appellant had possessed anhydrous ammonia and Sudafed. *Id.* at 250, 254. This circumstantial evidence, coupled with direct evidence of Appellant's concurrent possession of all of the other chemicals necessary to manufacture methamphetamine, was held to be sufficient evidence to sustain a conviction under KRS 218A.1432(1)(b). *Id.* at 254. It is an elementary principle of criminal jurisprudence that any fact at issue can be proven

---

**2.** Appellant's offense was committed before the 2002 General Assembly's enactment of KRS 218A.1437 (unlawful possession of a methamphetamine precursor). 2002 Ky. Acts, ch. 170, § 1.

by circumstantial evidence. *Baker v. Commonwealth,* 307 S.W.2d 773, 775 (Ky. 1957) ("Indirect and circumstantial evidence may be the basis of establishing the necessary elements of an offense."); *Denham v. Commonwealth,* 239 Ky. 771, 40 S.W.2d 384, 386 (1931) ("The corpus delicti may be established by circumstantial evidence as any other fact in the case." (Quotation omitted.)). No Member of this Court who participated in the numerous discussions, both oral and written, that ultimately culminated in the *Kotila* opinion ever claimed that the elements of the offense could not be proven by circumstantial evidence. The reason that issue was not addressed in *Kotila* was because no circumstantial evidence was presented in that case.

## II. *STARE DECISIS.*

In addition to *Varble,* this Court continued to follow or cite *Kotila* as the controlling construction of the 1998 version of KRS 218A. 1432(1)(b) in one unpublished opinion, *Marshall v. Commonwealth,* Nos. 2002–SC–0026–MR & 2003–SC–0068–TG, 2004 WL 314654, at *1 (Ky. Feb.19, 2004), and in the following published opinions authored by six different members of the court (in chronological order): *Beaty v. Commonwealth,* 125 S.W.3d 196, 212 (Ky. 2003) (op. by Cooper, J.); *Taylor v. Commonwealth,* 125 S.W.3d 216, 220 (Ky.2004) (op. by Wintersheimer, J.); *Johnson v. Commonwealth,* 134 S.W.3d 563, 568 (Ky. 2004) (op. by Johnstone, J.); *Pate v. Commonwealth,* 134 S.W.3d 593, 597 (Ky.2004) (op. by Keller, J.); *Fulcher v. Commonwealth,* 149 S.W.3d 363, 370 (Ky.2004) (op. by Cooper, J.); *Clemons v. Common-*

*wealth,* 174 S.W.3d 489, 490 (Ky.2005) (op. by Lambert, C.J.); *Robinson v. Commonwealth,* 181 S.W.3d 30, 36 (Ky.2005) (op. by Scott, J.). Likewise, in *Elkins v. Commonwealth,* 154 S.W.3d 298, 299 (Ky.App. 2004), and in ten additional unpublished decisions (which I will not specifically cite but which are reviewable on Westlaw among the total of 71 authorities citing *Kotila* since it was rendered on June 12, 2003), the Court of Appeals recognized *Kotila* as the controlling interpretation of former KRS 218A.1432(1)(b). This is in addition to numerous plea agreements[3] and jury instructions that have been premised upon *Kotila* since it was decided. The significance of this plethora of authorities that have cited and/or relied on our holding in *Kotila* is grounded in the ancient principle of *stare decisis.*

"*Stare decisis et non quieta movere:* To adhere to precedents, and not to unsettle things which are established." *Black's Law Dictionary* 1406 (6th ed.1990); *Ballard County v. Ky. County Debt Comm'n,* 290 Ky. 770, 162 S.W.2d 771, 773 (1942).

"While, perhaps, it is more important as to far-reaching juridical principles that the court should be right than merely in harmony with previous decisions, in the light of higher civilization, later and more careful examination of authorities, wider and more thorough discussion and more mature reflection upon the policy of the law, it nevertheless is vital that there be stability in the courts in adhering to decisions deliberately made after ample consideration."

*Ballard County,* 162 S.W.2d at 773 (quoting 14 Am.Jur. P. § 61, at 284–85).

**3.** Prosecutors have advised me at various conferences that both before and after *Kotila* was rendered, they would allow a defendant who possessed less than all of the chemicals or equipment necessary to manufacture methamphetamine to plead to the lesser offense of possession of drug paraphernalia, KRS 218A.500(2), or, if the offense was committed after July 15, 2002, unlawful possession of a methamphetamine precursor, KRS 218A.1437.

I am reminded of a conversation many years ago with a prominent practicing attorney, who later served with distinction as a Kentucky Circuit Court Judge. I asked him why he always appealed every case as far as the appellate process would allow. He replied, "I know what the law is today, but who knows what it will be tomorrow?" In fact, the most significant moment in the legal profession is not when the Supreme Court renders a seminal decision. It is when a client inquires of an attorney: "These are my facts; what is your advice?" Without stability and predictability in the law, an attorney may become a skilled litigator but will never become an informed counselor. If for no other reason, therein lies the importance of *stare decisis.* However, there are many other reasons.

The doctrine of *stare decisis,* or of adhering to the law of decided cases, has gradually evolved over hundreds of years. Thomas Healy, *Stare Decisis as a Constitutional Requirement,* 104 W. Va. L.Rev. 43, 55 (2001). The doctrine has its roots in medieval England, *id.* at 55–56, and reached its final form in the United States during the latter part of the nineteenth century. Frederick G. Kempin, Jr., *Precedent and Stare Decisis: The Critical Years, 1800 to 1850,* 3 Am. J. Legal Hist. 28, 50–51 (1959).

### A. Stare Decisis in the Courts of England.

In the mid-thirteenth century, Henry de Bracton, in his famous treatise discussing approximately 500 cases, first suggested the value of precedents in the law: "If new and unusual matters arise which have not before been seen in the realm, if like matters arise let them be decided by like, since the occasion is a good one for proceeding *a similibus ad similia.*" 2 Henry de Bracton, *On the Laws and Customs of England* 21 (G. Woodbine ed.1968). How-

ever, Bracton's use of cases was "not based on their authority as sources of law, but upon his personal respect for the judges who decided them, and his belief that they raise[d] and discuss[ed] questions upon lines which he consider[ed] sound." Theodore F.T. Plucknett, *A Concise History of the Common Law* 181 (1929). Bracton's "use of decided cases accustomed lawyers ... to discussing cases, and this [was] a significant step in the development of a case law system." James W. Tubbs, *The Common Law Mind: Medieval and Early Modern Conceptions* 20 (2000).

Bracton's example might have fostered the publication of the Year Books, Plucknett, *supra,* at 182, a digest of court cases compiled during the approximate period from 1283 to the mid-sixteenth century. Healy, *supra,* at 58. The Year Books, although not supporting a system of binding case law, Tubbs, *supra,* at 180, did affect "the conception and application of precedent." Carleton Kemp Allen, *Law in the Making* 202 (7th ed.1964). In the fifteenth century, when written pleadings replaced oral pleadings, the Year Books began to focus on the substantive issues in cases, thus fostering the notion of binding precedent. Harold Potter, *Potter's Historical Introduction to English Law and its Institutions* 276 (A.K.R. Kiralfy ed., 4th ed.1958); T. Ellis Lewis, *The History of Judicial Precedent IV,* 48 L.Q. Rev. 230, 231–32 (1932). "Judges also became increasingly conscious of the way their decisions would shape the law." Healy, *supra,* at 60. An early use of the concept of precedent was recorded in the year 1469, when a judge named Yelverton stated: "[F]or this case has never been seen before, and therefore our present judgement will be taken for a precedent hereafter." Allen, *supra,* at 198–99. Despite "regard for previous decisions," judges during this period looked to prior cases primarily to

"save trouble," *i.e.*, for convenience, and to avoid "considering a question *de novo* if it had recently been decided." Plucknett, *supra*, at 302. They did not view precedents as a restraint on their judicial authority. Allen, *supra*, at 199–200.

In the mid-sixteenth century, the Year Books were replaced by a series of law reports named for their authors. Potter, *supra*, at 271, 273. The law reports "document the gradual emergence over the next two centuries of the view that precedents are not only instructive guides that help maintain consistency, but are authoritative statements of the law that should be followed in most cases." Healy, *supra*, at 62. Sir Edward Coke, who served as Chief Justice of the Court of Common Pleas and later as Lord Chief Justice of the King's Bench, was particularly influential in this development. Plucknett, *supra*, at 163–66.

Coke believed "ardently in the force of example and tradition in all things legal . . . [and] he had great faith in precedent." Allen, *supra*, at 207. In an early example of the declaratory theory of law, Healy, *supra*, at 62, he stated that the Year Book cases were "the best proof [of] what the law is." Allen, *supra*, at 207. Coke helped secure a central role for precedent by (1) authoring a thirteen-volume treatise, "The Reports," which was "the most thorough collection of cases that had ever appeared;" and (2) citing Year Book cases to challenge the King's authority to exercise jurisdiction over legal issues. Healy, *supra*, at 62–63. Coke's reports were extremely influential and, as they "facilitated the citation of authorities in Court . . . , the practice became much more frequent." Lewis, *supra*, at 235. Coke's challenge to the King's authority culminated in his famous decision in *Prohibitions del Roy*, 77 Eng. Rep. 1342 (K.B.1607), wherein he responded to James I's argument that "the law was found upon reason" and "that he and others had reason as well as the judges" by holding that "causes which concern the life . . . or fortunes of his subjects are not to be decided by natural reason but by the artificial reason and judgment of law, which . . . requires long study and experience." *Id.* at 1343; Catherine Drinker Bowen, *The Lion and the Throne: The Life and Times of Sir Edward Coke* 305 (1957). Coke's invocation of "artificial reason" claimed "a special place for precedent in the decision-making process because the long study and experience he spoke of was essentially the learning of cases." Healy, *supra*, at 64.

After Coke's death in 1633, the theory and practice of *stare decisis* was in considerable flux. Allen, *supra*, at 209. Some judges "expressed an obligation to follow decisions they disliked," while others "continued to assert the right to disregard precedents they thought incorrect." Healy, *supra*, at 66–67. This "mixed attitude toward precedent" in the seventeenth and eighteenth centuries stemmed from (1) a medieval belief in the so-called "natural law," and (2) the poor quality of early reports. *Id.* at 67–68.

The jurisprudential "natural law" theory was premised upon the notion that there is "a Law that transcends . . . individual laws . . ., ultimately derived from God." Kevin Ryan, *Lex Et Ratio: Coke, the Rule of Law, and Executive Power*, Vt. B.J., Spring 2005, at 9, 10. This "higher" law was used to evaluate actual positive laws. *Id.* Belief in the "natural law" necessitated the use of the declaratory theory of the law in deciding cases. Healy, *supra*, at 67–68. Under the declaratory theory, law existed as a Platonic ideal, and "cases were mere evidence of the law as opposed to comprising the law itself." Christian F. Southwick, *"Unprecedented: The Eighth Circuit Repaves Antiguas Vias with a New Constitutional Doctrine*," 21 Rev. Li-

tig. 191, 236 (2002). Since a prior case was only evidence of the law, "no judge could ever be absolutely bound to follow it, and it could never be effectively overruled because a subsequent judge might always treat it as having some evidential value." Rupert Cross & J.W. Harris, *Precedent in English Law* 30 (4th ed.1991).

> The declaratory theory was a tidy compromise between the dictates of natural law and the growing pressure to follow precedent. Because judges regarded decisions as evidence of the law, they could justify their adherence to precedent by pointing to the weight of the authorities on a given issue. At the same time, they could evaluate past decisions as they would any other evidence. Thus, they frequently claimed that a decision was bad evidence of the law because it was unjust, inconvenient, or absurd.

Healy, *supra*, at 68 (footnotes omitted). Today, this approach might accurately be described as "result-oriented."

The poor quality of law reports before the nineteenth century also made it difficult to adopt a system of binding precedent. W.S. Holdsworth, *Case Law*, 50 L.Q. Rev. 180, 187–88 (1934); Lewis, *supra*, at 230. Judges issued their opinions orally, and the bar relied upon law reporters to record them. Robert J. Martineau, *The Value of Appellate Oral Argument: A Challenge to the Conventional Wisdom*, 72 Iowa L.Rev. 1, 7–8 (1986). However, the reports were unreliable and imprecise. Lewis, *supra*, at 244. Judges could not rely on reports of questionable authority when making decisions and sometimes refused to follow precedents they could not verify. Holdsworth, *supra*, at 187–88.

More accurate law reports began to appear in the mid-eighteenth century, Potter, *supra*, at 274; Lewis, *supra*, at 230, but conflicting views about the force of precedent persisted. David Lieberman, *The Province of Legislation Determined: Legal Theory in Eighteenth-century Britain* 86–87 (1989). The views of Blackstone and Lord Mansfield provide examples of this conflict. Southwick, *supra*, at 246–47. Blackstone was a leading proponent of *stare decisis:*

> For it is an established rule to abide by former precedents, where the same points come again in litigation: as well to keep the scale of justice even and steady, *and not liable to waver with every new judge's opinion;* as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from, according to his private sentiments: he being sworn to determine not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.

Healy, *supra*, at 70 (emphasis added) (quoting 1 William Blackstone, *Commentaries* *69). Blackstone limited this assertion by adding that judges were not bound by precedents that were "evidently contrary to reason," Southwick, *supra*, at 249 (quoting 1 Blackstone, *supra*, at *69), or "flatly absurd or unjust." Allen, *supra*, at 229 (quoting 1 Blackstone, *supra*, at *70). Though Blackstone often expounded the declaratory theory of the law, writing that "the decisions of courts of justice are the evidence of what is common law," Southwick, *supra*, at 251 n. 319 (quoting 1 Blackstone, *supra*, at *71), he was "one of the first writers to speak of the rule of precedent as one of general obligation, and he left far less room for discretion than his predecessors." Healy, *supra*, at 70. Mansfield, by contrast, often did not follow precedent. Allen, *supra*, at 211; Lieber-

man, *supra*, at 122–33. He "did not hesitate to reverse erroneous points of practice ... when found to be absurd or *inconvenient*." Allen, *supra*, at 216 n. 1 (emphasis added) (quotation omitted).

The conflict between Blackstone and Mansfield "reached its climax in *Perrin v. Blake*," Healy, *supra*, at 71, a case concerning the Rule in Shelley's Case, which had been promulgated by Coke. Lieberman, *supra*, at 135–42. Mansfield, ruling from the King's Bench, declined to follow the Rule, arguing that it defied reason to subvert the intention of a clearly written will. 98 Eng. Rep. 355 (K.B.1770); Healy, *supra*, at 71. However, Blackstone, ruling from the Exchequer Chamber on appeal, reversed Mansfield's decision and held that a court did not have the power to disturb the rule. 10 Eng. R.C. 689 (Exch. Ch. 1771); Lieberman, *supra*, at 136, 138–39. Thus, "[b]y the beginning of the nineteenth century, [English] courts began to regard a line of decisions as absolutely binding," and "by the latter half of the nineteenth century, [they] asserted an obligation to follow all prior cases, no matter how incorrect." Healy, *supra*, at 72.

### B. Stare Decisis in American Courts.

Adoption of the rule of *stare decisis* in the United States occurred gradually between 1800 and 1850. Kempin, *supra*, at 50. During the pre-revolutionary period, "despite some fidelity to past cases, colonial courts did not feel bound by precedents and were more likely to search for principles in the law than for a decision on all fours with the case at hand." Healy, *supra*, at 78. The declaratory theory of the law still held sway after independence, and adherence to it "significantly retarded the solidification of binding precedent." Southwick, *supra*, at 263.

The Framers' view of precedent is evidenced by the writings of Alexander Hamilton and James Madison. Hamilton believed that "[t]o avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them." Thomas R. Lee, *Stare Decisis in Historical Perspective: From the Founding Era to the Rehnquist Court*, 52 Vand. L.Rev. 647, 663 (1999) (quoting *The Federalist No. 78*, at 471 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). In contrast, "Madison conceived of a rule of stare decisis that was tempered by countervailing policies and exceptions." *Id.* at 664. He wrote that judicial precedents had "binding influence" "*when formed on due discussion and consideration, and deliberately sanctioned by reviews and repetitions*." Letter from James Madison to Charles Jared Ingersoll (June 25, 1831), *reprinted in* Marvin Meyers, *The Mind of the Founder: Sources of the Political Thought of James Madison* 391 (1981) (emphasis added). However, Madison did not claim that an *individual* decision, *i.e.*, one not sanctioned by reviews and repetitions, was binding on subsequent judges. Healy, *supra*, at 87.

James Kent's views on *stare decisis* were similar to those of Madison. Lee, *supra*, at 665–66. Influenced by the declaratory theory of the law, he wrote that: "A solemn decision upon a point of law, arising in any given case becomes an authority in a like case, because it is the highest evidence which we can have of the law applicable to the subject." *Id.* at 666 (quoting 1 James Kent, *Commentaries on American Law* 475 (O.W. Holmes, Jr. ed., 12th ed., Boston, Little, Brown, & Co. 1896)). "The founding-era doctrine of precedent thus was in an uneasy state of internal conflict." *Id.*

However, "[t]he American commitment to stare decisis gradually strengthened during the nineteenth century, due mainly to the emergence of reliable law reports and a positivist conception of law." Healy, *supra*, at 87. Legal positivists "conceived of the common law in terms of judge-made law, not as mere evidence of the law's content." Southwick, *supra*, at 253. Logically, "prior decisions were conceived of as positive law [that] carried the force of law," and, thus, "[p]ositivism … laid the foundations for binding precedent." *Id.* at 253–54. However:

American courts never adopted the nineteenth century English rule that precedents are absolutely binding in all circumstances. They instead reserved the right to overrule decisions that were absurd or egregiously incorrect. However, during the "formative period of the doctrine … from 1800 to 1850," they accepted that prior decisions were presumptively binding and that *mere disagreement alone is not sufficient to justify departure from the past.*

Healy, *supra*, at 88 (emphasis added) (footnotes omitted) (quoting Kempin, *supra*, at 50). Thus, by around 1850, "the foundation for binding precedent in America was complete, and the law persistently moved in that direction thereafter." Southwick, *supra*, at 274.

The United States Supreme Court gives heed to the doctrine of *stare decisis* even when individual Justices may disagree with precedent. Caleb Nelson, *Stare Decisis and Demonstrably Erroneous Precedents*, 87 Va. L.Rev. 1, 2–3 (2001).

*[S]tare decisis* [is] the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact.

*Vasquez v. Hillery*, 474 U.S. 254, 265–66, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986). *See also Mathews v. United States*, 485 U.S. 58, 66–67, 108 S.Ct. 883, 888–89, 99 L.Ed.2d 54 (1988) (Brennan, J., concurring) ("I write separately only because I have previously joined or written four opinions dissenting from this Court's holdings that the defendant's predisposition is relevant to the entrapment defense…. Were I judging on a clean slate, I would still be inclined to adopt the view that the entrapment defense should focus exclusively on the Government's conduct. But I am not writing on a clean slate; the Court has spoken definitively on this point. Therefore, I bow to *stare decisis* …."); *Scott v. Illinois*, 440 U.S. 367, 374–75, 99 S.Ct. 1158, 1162, 59 L.Ed.2d 383 (1979) (Powell, J., concurring) ("Despite my continuing reservations about the *Argersinger* rule, it was approved by the Court in the 1972 opinion and four Justices have reaffirmed it today. It is important that this Court provide clear guidance to the hundreds of courts across the country that confront this problem daily. Accordingly, and mindful of *stare decisis*, I join the opinion of the Court.").

In the United States, "*stare decisis* is generally understood to mean that precedent is presumptively binding. In other words, *courts cannot depart from previous decisions simply because they disagree with them.*" Healy, *supra* at 52 (emphasis added); *see also* Nelson, *supra*, at 8 ("The doctrine of stare decisis would indeed be no doctrine at all if courts were free to overrule a past decision *simply because they would have reached a different decision as an original matter.*" (Emphasis added.)). However, judges may "disre-

gard precedent if they offer some special justification for doing so." Healy, *supra*, at 52; *see also, Dickerson v. United States*, 530 U.S. 428, 443–44, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000) ("The meaning of *Miranda* has become reasonably clear and law enforcement practices have adjusted to its strictures .... While *stare decisis* is not an inexorable command, ... the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some special justification." (Citations and quotations omitted.)); *Hubbard v. United States*, 514 U.S. 695, 716, 115 S.Ct. 1754, 1765, 131 L.Ed.2d 779 (1995) (Scalia, J., concurring) (stating that the decision to overrule must be supported by "reasons that go beyond mere demonstration that the overruled opinion was wrong (otherwise the doctrine would be no doctrine at all)"); *Planned Parenthood v. Casey*, 505 U.S. 833, 864, 112 S.Ct. 2791, 2814, 120 L.Ed.2d 674 (1992) (O'Connor, Kennedy, and Souter, JJ., plurality opinion) (stating that "a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided").

The Supreme Court accepts *stare decisis* in great part for prudential reasons: it promotes judicial economy, stability, and legitimacy. Lee, *supra*, at 652; Southwick, *supra*, at 212–13; *cf. Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) ("*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.").

[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure founda-

tion of the courses laid by others who had gone before him.

Benjamin Cardozo, *The Nature of the Judicial Process* 149 (1921). A general rule of adherence to precedent "expedites the work of the courts by preventing the constant reconsideration of settled questions." Robert von Moschzisker, *Stare Decisis in Courts of Last Resort*, 37 Harv. L.Rev. 409, 410 (1924).

[T]he Court has sometimes suggested that the goal of stability encompasses reliance interests that extend beyond the commercial context, including the preservation of "the psychologic need to satisfy reasonable expectations," or even the retention of governmental action undertaken in reliance on precedent.

Stare decisis is also thought to preserve the Court's legitimacy.... [S]tare decisis contributes to the integrity of our constitutional system of government, both in appearance and in fact, by preserving the presumption that bedrock principles are founded in the law rather than in the proclivities of individuals.

Lee, *supra*, at 653 (quotations and footnotes omitted); *see also Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339 (1970) ("Very weighty considerations underlie the principle that courts should not lightly overrule past decisions. Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.").

### C. Deference to Statutory Construction Precedents.

One of the "most basic question[s] that any system of precedent must answer is

whether a prior decision is entitled to deference when it is later thought to be in error." Lee, *supra*, at 654. The answer often depends on the statutory or constitutional nature of the decision. Lawrence C. Marshall, *"Let Congress Do It": The Case for an Absolute Rule of Statutory Stare Decisis*, 88 Mich. L.Rev. 177, 181 (1989); *see also Harmelin v. Michigan*, 501 U.S. 957, 965, 111 S.Ct. 2680, 2686, 115 L.Ed.2d 836 (1991) ("We have long recognized, of course, that the doctrine of *stare decisis* is less rigid in its application to constitutional precedents . . . ."); *Glidden Co. v. Zdanok*, 370 U.S. 530, 543, 82 S.Ct. 1459, 1469, 8 L.Ed.2d 671 (1962) (noting "this Court's considered practice not to apply stare decisis as rigidly in constitutional as in nonconstitutional cases"). The United States Supreme Court gives "great weight to *stare decisis* in the area of statutory construction," *Neal v. United States*, 516 U.S. 284, 295, 116 S.Ct. 763, 768–69, 133 L.Ed.2d 709 (1996) ("Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis* . . . ."), and holds that the doctrine "is at its weakest when [it] interpret[s] the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Agostini v. Felton*, 521 U.S. 203, 235, 117 S.Ct. 1997, 2016, 138 L.Ed.2d 391 (1997).

The U.S. Supreme Court views statutory precedent as *"per se* entitled to great weight." Lee, *supra*, at 732 (citing *Johnson v. Transp. Agency*, 480 U.S. 616, 629 n. 7, 107 S.Ct. 1442, 1450 n. 7, 94 L.Ed.2d 615 (1987); *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 357, 74 S.Ct. 78, 79, 98 L.Ed. 64 (1953) (per curiam)). Indeed, "[i]n no less significant a case than *Erie Railroad v. Tompkins* [304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ], the Court indicated that it would have been unwilling to overrule *Swift v. Tyson* [41 U.S. 1 (1842) ], 'if only a question of statutory construction

were involved.'" Marshall, *supra*, at 181 (footnotes omitted) (quoting *Erie Railroad*, 304 U.S. at 77, 58 S.Ct. at 822). "Because 'Congress, not th[e] Court, has the responsibility for revising its statutes,' the Rehnquist Court has often expressed a heightened reluctance to overturn statutory precedent." Lee, *supra*, at 705 (quoting *Neal*, 516 U.S. at 296, 116 S.Ct. at 769). Other modern U.S. Supreme Court cases evidencing the Court's deference to statutory precedents include *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424, 106 S.Ct. 1922, 1931, 90 L.Ed.2d 413 (1986); *NLRB v. International Longshoremen's Ass'n*, 473 U.S. 61, 84, 105 S.Ct. 3045, 3058, 87 L.Ed.2d 47 (1985); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97 S.Ct. 2061, 2070, 52 L.Ed.2d 707 (1977); and *Edelman v. Jordan*, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359–60, 39 L.Ed.2d 662 (1974). *See also Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 283–84, 115 S.Ct. 834, 844, 130 L.Ed.2d 753 (1995) (O'Connor, J., concurring) (reiterating her view that the majority had been wrong in deciding the same issue in a previous case but joining the majority in this case "because there is no 'special justification' to overrule [it]" (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212, 104 S.Ct. 2305, 2310–11, 81 L.Ed.2d 164 (1984))); *Patterson v. McLean Credit Union*, 491 U.S. 164, 173–74, 109 S.Ct. 2363, 2370–71, 105 L.Ed.2d 132 (1989).

This very case exemplifies why courts give heightened deference to statutory construction as opposed to constitutional construction. This Court rendered *Kotila*, construing former KRS 218A.1432(1)(b), in June 2003. Two years later, the General Assembly, whose job it is to make the laws, amended the statute, exactly as envisioned by the U.S. Supreme Court in *Neal*, 516 U.S. at 296, 116 S.Ct. at 769 ("Congress, not th[e] Court, has the responsibili-

ty for revising its statutes."). Today, however, with no "special justification" to do so, *Rumsey*, 467 U.S. at 212, 104 S.Ct. at 2310–11, the majority of this Court revises our construction of former KRS 218A.1432(1)(b) and retroactively applies that construction to Appellant—in direct contradiction of the doctrine of *stare decisis.*

### D. Stare Decisis in Kentucky.

Kentucky is generally recognized as one of the earliest of the individual states to adopt the doctrine of *stare decisis. See* Kempin, *supra,* at 46–47; Southwick, *supra,* at 263; Nelson, *supra,* at 68 n. 224.

> [W]hatever might be the opinion of the court, was the question new, this court can not depart from the former adjudications and conceives the matter ought to be at rest.
>
> . . . .
>
> It has been often said, that it is not so important that the law should be rightly settled, as that it should remain stable after it is settled. This is true, for attempts to change the course of judicial decision, under the pretext of correcting error, are like experiments by the quack on the human body. They constantly harass and often jeopardize it.

*South's Heirs v. Thomas' Heirs,* 23 Ky. (7 T.B. Mon.) 59, 62–63 (1828). Less than three months later, our predecessor court further expounded on the importance of stability in the law, *viz:*

> If we were convinced that on this point the law was settled wrong originally, we should not feel ourselves at liberty to depart from it; aware, that it is of greater importance to society, that the rule should be uniform and stable, than that it should be the best possible rule that could be adopted. In the supreme court of a state, as this is, possessing, with but few exceptions, appellate judicial power

co-extensive with the state, the influence which its decisions must have, is evident. Its mandates are conclusive, and even its dicta are attended to in all the inferior courts. No sooner is a decision published, than it operates as a pattern and standard in all other tribunals, and a[s] a matter of course, all other decisions conform to it. If in this court, a settled course of adjudication is overturned, then the trouble and confusion of reversing former causes succeeds in the inferior tribunals; *and even the credit and respect due to this court is shaken, by the phenomenon that A has lost his cause on the same ground that B gains his.* And not only do these consequences follow, but some still more serious may ensue. For perhaps no court may strike the vitals of society with a deeper wound than a capricious departure in this court from one of its established adjudications. We ought, therefore, to be cautious not to leave a course well understood; and nothing but the imperious demands of justice could justify it. Here there is no such demand upon us.

*Tribble v. Taul,* 23 Ky. (7 T.B. Mon.) 455, 456–57 (1828) (emphasis added).

There is a substantial body of case law in Kentucky following that rule. Here (in chronological order) are a few of our most significant cases decided since *Tribble:*

*Morgan's Heirs v. Parker,* 31 Ky. (1 Dana) 444, 444 (1833) ("This court having, by two decisions, settled the identity of an object called for in an entry, will, in subsequent cases, upon the same evidence, adhere to the former decisions—though the opposing evidence may seem to the present judges to preponderate."); *Blankenship v. Bartleston & Co.,* 6 Ky. Op. 158, 158 (1872) ("It is better that the law should remain permanent so far as judicial action is concerned, although settled originally

upon doubtful principles, than that it should be subject to constant fluctuations according to the views and opinions which might be entertained by the court as constituted, at the time the same question might at some subsequent time arise."); *Commonwealth v. Louisville Gas Co.,* 135 Ky. 324, 122 S.W. 164, 166 (1909) ("Had we doubt of the correctness of that construction, we should not feel at liberty to depart from it after it has been so long and definitely settled, and the business of the state has become adapted to it."); *Jackson's Adm'r v. Asher Coal Co.,* 153 Ky. 547, 156 S.W. 136, 137 (1913) ("When a statute is fairly open to two constructions, either one of which will carry out its purpose, and this court, upon full consideration, adopts one of these constructions, it should be adhered to, especially when, as in this instance, it has become a settled part of the law."); *McCormack v. Louisville & Nashville R.R.,* 156 Ky. 465, 161 S.W. 518, 520 (1913) ("In Cooley's Constitutional Limitations it is said that, when a rule has been once deliberately adopted and declared, it ought not to be disturbed unless by a court of appeal or review, and never by the same court, except for very urgent reasons, and upon a clear manifestation of error; and that if the practice were otherwise, it would be leaving us in a perplexed uncertainty as to the law. Upon the principle of stare decisis, the decisions which have been rendered by a court will be adhered to by such court in subsequent cases, unless there is something manifestly erroneous therein, or the rule or principle of law established by such decisions has been changed by legislative enactment." (Citations omitted.)).

*See also Herndon v. Brawner,* 180 Ky. 807, 203 S.W. 727, 729 (1918) ("[U]nder the doctrine of stare decisis we should not now depart from that [statutory] construction, for after all the completed statute is the construction given to it by the highest court within the jurisdiction where it prevails ...."); *Bd. of Comm'rs v. Ky. Utils. Co.,* 267 Ky. 99, 101 S.W.2d 414, 416 (1936) ("It is our duty to consider the ordinances antedating that of 1935 as we interpreted them in those cases, and not as if they were now presented to us for the first time."); *Daniel's Adm'r v. Hoofnel,* 287 Ky. 834, 155 S.W.2d 469, 471 (1941) ("Regardless of what the views of the court as now constituted may be as to the soundness of the construction originally given the Constitution in Commonwealth v. Haly, supra, we are of the opinion that the construction should be adhered to under the doctrine of stare decisis. The maxim or phrase is: 'Stare decisis et non quiet mover,' to stand by precedents and not disturb settled points. This wholesome rule is not inflexible or so imperative as to require perpetration of error, but departure from the policy it declares can be justified only upon substantial grounds."); *City of Louisville v. Presb. Orphans Home Soc'y of Louisville,* 299 Ky. 566, 186 S.W.2d 194, 199 (1945) ("[*Stare decisis* ] is a judicial creation and within judicial control, but it serves a necessary purpose, stabilization of the law, and should not be abandoned or substantially impaired. Its salutary effect as a stabilizing influence on the law must be preserved."); *Commonwealth v. Blair,* 592 S.W.2d 132, 133 (Ky. 1979) ("Judicial consistency must be observed in order to maintain a responsible and efficient court system.").

*See also Corbin Motor Lodge v. Combs,* 740 S.W.2d 944, 946 (Ky.1987) ("Unless the need to change the law is compelling, the majority of this court is of the opinion that stability in the law is of sufficient importance to require that we not overturn established precedent which itself is based upon a reasonable premise."); *Schilling v. Schoenle,* 782 S.W.2d 630, 633 (Ky.1990) ("Appellate courts should follow

established precedent unless there is a compelling and urgent reason to depart therefrom which destroys or completely overshadows the policy or purpose established by the precedent."); *Yeoman v. Commonwealth, Health Policy Bd.,* 983 S.W.2d 459, 469 (Ky.1998) ("Unlike some jurisdictions, stare decisis has real meaning to this Court. Given the fact that *Smith* was decided in 1994, we can find no reason that is adequate to overcome the burden imposed by stare decisis.... Since the issue was resolved so recently by this Court in *Smith,* we find no compelling reason to suddenly change our decision in this matter."); *Ky. Dept. of Corr. v. McCullough,* 123 S.W.3d 130, 141 (Ky.2003) (Cooper, J. (joined by Graves, J.), concurring) ("Despite my continuing belief that *Department of Corrections v. Furr,* Ky., 23 S.W.3d 615 (2000), was wrongly decided, four Justices (including one who joined my dissent in *Furr* ) have reaffirmed it today, albeit *sub silentio.* Accordingly, and mindful of *stare decisis,* I join the opinion of the Court ....").

We have recognized exceptions to the rule of *stare decisis* when "a question ...

has been passed upon on a single occasion," so that the "decision can in no just sense be said to have been acquiesced in," *Montgomery County Fiscal Ct. v. Trimble,* 104 Ky. 629, 47 S.W. 773, 776 (1898) (overruling *Belknap v. City of Louisville,* 99 Ky. 474, 36 S.W. 1118 (1896)), or to have been "deliberately sanctioned by review and repetition," *Letter from James Madison to Charles Jared Ingersoll, supra. See also Morrow v. Commonwealth,* 77 S.W.3d 558, 559–60 (Ky.2002) (overruling *Gray v. Commonwealth,* 979 S.W.2d 454 (Ky.1998); *Thomas v. Commonwealth,* 864 S.W.2d 252, 260 (Ky.1993) (*abrogating Dunbar v. Commonwealth,* 809 S.W.2d 852 (Ky.1991)).[4] We have also departed from the principle of *stare decisis* when, because of the passage of time and changes in societal norms, the previous rule is no longer supportable. *D & W Auto Supply v. Dep't of Revenue,* 602 S.W.2d 420, 424 (Ky.1980); *see also Bentley v. Bentley,* 172 S.W.3d 375, 378 (Ky.2005) (advent and prevalence of liability insurance removed justification for doctrine of parental immunity); *Hilen v. Hays,* 673 S.W.2d 713, 717

**4.** The string-cite in Justice Graves's concurring opinion of cases in which we have overruled prior precedent, *ante,* at 609, supports this principle, as none of those cases overruled an aspect of a prior case that had been relied upon in the holding of an intervening decision. *See Stopher v. Conliffe,* 170 S.W.3d 307, 310 (Ky.2005) (purporting to overrule in part *Foley v. Commonwealth,* 17 S.W.3d 878 (Ky.2000), though misconstruing the holding in *Foley* ); *Fletcher v. Commonwealth,* 163 S.W.3d 852, 871 (Ky.2005) (overruling *Miller v. Quertermous,* 304 Ky. 733, 202 S.W.2d 389 (1947), which was also a constitutional precedent, not a statutory precedent, thus entitled to less deference under *stare decisis* ); *Matthews v. Commonwealth,* 163 S.W.3d 11, 26–27 (Ky.2005) (overruling in part *Young v. Commonwealth,* 968 S.W.2d 670 (Ky.1998)); *Commonwealth v. Mobley,* 160 S.W.3d 783, 787 (Ky.2005) (overruling in part *Mash v. Commonwealth,* 769 S.W.2d 42 (Ky.1989)); *St. Clair v. Commonwealth,* 140 S.W.3d 510,

532, 570 (Ky.2004) (overruling *Schweinefuss v. Commonwealth,* 395 S.W.2d 370 (Ky.1965), and overruling in part *Thompson v. Commonwealth,* 862 S.W.2d 871 (Ky.1993) (previously cited only in *dictum* in *Hodge v. Commonwealth,* 17 S.W.3d 824, 852 (Ky.2000))); *Hampton v. Commonwealth,* 133 S.W.3d 438, 442 (Ky.2004) (overruling *Commonwealth v. Hillebrand,* 536 S.W.2d 451 (Ky.1976), insofar as it incorrectly interpreted *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (*Hillebrand* cited only in *dictum* in *Ignatow v. Ryan,* 40 S.W.3d 861, 864 (Ky. 2001), and *Benton v. Crittenden,* 14 S.W.3d 1, 5 (Ky.1999))); *Rapier v. Philpot,* 130 S.W.3d 560, 564 (Ky.2004) (overruling in part *Swatzell v. Commonwealth,* 962 S.W.2d 866 (Ky. 1998)); *cf. Regenstreif v. Phelps,* 142 S.W.3d 1, 2 (Ky.2004) (overruling *Bass v. Williams,* 839 S.W.2d 559 (Ky.App.1992)); *Messer v. Messer,* 134 S.W.3d 570, 573 (Ky.2004) (overruling *John v. John,* 893 S.W.2d 373 (Ky.App. 1995)).

(Ky.1984) (following majority of states in adopting the more equitable comparative negligence doctrine in place of rule that contributory negligence is a complete bar to recovery).

Neither of those exceptions exists here. Nor was the construction that *Kotila* placed on the 1998 version of KRS 218A.1432(1)(b) "wholly illogical and entirely unsupported by reason," *Stoll Oil Ref. Co. v. State Tax Com'n,* 221 Ky. 29, 296 S.W. 351, 352 (1927), or "manifestly erroneous," *McCormack,* 161 S.W. at 520. In fact, it was supported by basic principles of statutory construction and an elementary principle of English grammar. Finally, there is no "compelling and urgent reason" to depart from that construction. *Schilling,* 782 S.W.2d at 633. Lower courts and law enforcement agencies have adjusted to it, *Dickerson v. U.S.,* 530 U.S. at 443, 120 S.Ct. at 2336; prosecutors and defendants have implemented plea agreements in reliance upon it; and trial courts have instructed juries in accordance with it.

### E. Conclusion.

The ancient doctrine of *stare decisis,* coupled with the related doctrines of *res judicata* and collateral estoppel, ensure that we are governed by the rule of law, not men. *Vasquez v. Hillery,* 474 U.S. 254, 265–66, 106 S.Ct. 617, 88 L.Ed.2d 598. 474 U.S. 254, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986) ("[*Stare Decisis* ] permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact."); *Welch v. Tex. Dept. of Hwys. & Public Transp.,* 483 U.S. 468, 494, 107 S.Ct. 2941, 2957, 97 L.Ed.2d 389 (1987) ("[T]he doctrine of *stare decisis* is of fundamental importance to the rule of

law."); *see also Harris v. United States,* 536 U.S. 545, 556, 122 S.Ct. 2406, 2414, 153 L.Ed.2d 524 (2002) (same). This Court as newly constituted now holds Jeffrey Matheney guilty of a Class B felony under the same statute and facts for which others similarly situated have been found guilty only of a Class A misdemeanor or a Class D felony. In my view, subjecting Appellant to a higher penalty ceiling than other similarly-situated defendants who committed the same conduct, merely because a change in the membership of this Court occurred before his appeal became final, has Fourteenth Amendment implications. *Cf. Williams v. Illinois,* 399 U.S. 235, 244, 90 S.Ct. 2018, 2023–24, 26 L.Ed.2d 586 (1970) ("[T]he Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status."). It is also as true today as it was in 1828 that "the credit and respect due to this court is shaken, by the phenomenon that A has lost his cause on the same ground that B gains his." *Tribble,* 23 Ky. (7 T.B. Mon.) at 456.

It is particularly ironic that today's majority opinion is authored by one who strongly criticized this Court for straying from what he perceived to be the rule of law, which he argued was embodied in the United States Supreme Court's decision in *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), *overruled by Lawrence v. Texas,* 539 U.S. 558, 578, 123 S.Ct. 2472, 2483, 156 L.Ed.2d 508 (2003). John C. Roach, *Rule of Men,* 81 Ky. L.J. 483, 484 (1992–93).

[N]o matter how little authority, how little precedent, and how little textual constitutional support exists, certain justices on the Kentucky Supreme Court are willing to usurp the rule of law, as enacted by Kentucky's duly elected legislators and as embodied by the framers

in the Kentucky Constitution, in order to effect any result that seems correct to the justices despite rational and undeniable proof to the contrary.

*Id.* at 483.

[T]here is not much left of the Kentucky Constitution and honest judicial interpretation in Kentucky. Four men have decided to usurp the rule of law and have substituted for it their "reasoned judgment" despite overwhelming evidence against their conclusion. One can only wonder what the reign of this "rule of men" has in store.

*Id.* at 510. Yes, one can only wonder.

### III. VOID FOR VAGUENESS.

In addition to ignoring basic principles of statutory interpretation and the central importance of *stare decisis* in the rule of law, the majority construes former KRS 218A.1432(1)(b) in a manner that renders it unconstitutionally vague. To satisfy the void-for-vagueness doctrine, a . criminal statute must define an offense with sufficient clarity that persons of ordinary intelligence "can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *State Bd. for Elem. and Secondary Educ. v. Howard,* 834 S.W.2d 657, 662 (Ky.1992); *Wilfong v. Common-*

*wealth,* 175 S.W.3d 84, 95–96 (Ky.App. 2004). "The 'void for vagueness' doctrine, therefore, attempts to ensure fairness by requiring an enactment to provide: (1) 'fair notice' to persons and entities subject to it regarding what conduct it prohibits; and (2) sufficient standards to those charged with enforcing it so as to avoid arbitrary and discriminatory application." *Lexington Fayette County Food & Bev. Ass'n v. Lexington–Fayette Urban County Gov't,* 131 S.W.3d 745, 754 (Ky.2004). *See also Martin v. Commonwealth,* 96 S.W.3d 38, 59 (Ky.2003). Though both inquiries are important, "the more important aspect of the vagueness doctrine is not actual notice, but ... the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender,* 461 U.S. at 358, 103 S.Ct. at 1858 (citation and quotation omitted).

One of the claims made in *Kotila* was that the trial court's statutory interpretation of "the chemicals or equipment" to mean "any two or more of the chemicals or equipment" (the interpretation adopted by today's majority opinion) rendered the statute "void for vagueness" because it purported to criminalize the possession of ordinary household items that could be purchased at any department store. 114 S.W.3d at 249. *Kotila* held that the constitutional challenge was defeated by the statutory construction that "the chemicals or equipment" means "all of the chemicals or equipment."

As we noted in *Commonwealth v. Hayward, supra,* "there is no reason other than the manufacture of methamphetamine for having a combination of pseudoephedrine, lye, rock salt, iodine crystals, red phosphorus, toluene, sulfuric acid, and hydrochloric acid in one place." 49 S.W.3d at 676. The same is true with respect to the chemicals and equipment necessary to manufacture methamphet-

amine by the ephedrine reduction method....

> ... [T]he requirement that the defendant possess all of the chemicals or all of the equipment constituting the right combination virtually eliminates the possibility of arbitrary or subjective enforcement. Finally, ... the additional requirement that the possession be with the intent to manufacture methamphetamine cures any uncertainty as to the nature of the conduct proscribed. We conclude that KRS 218A.1432(1)(b) is not unconstitutionally vague.

Id. at 249 (emphasis added). The improbability of possession of the exact combination of chemicals or equipment necessary to manufacture methamphetamine is heightened by the fact that at least one necessary chemical (anhydrous ammonia) and at least one necessary item of equipment (storage container for anhydrous ammonia, often a modified propane tank) are not ordinary household items.

The majority opinion concludes that the statute's intent requirement alone satisfies the vagueness doctrine. Ante, at 604–05. While the intent requirement does satisfy the "notice" inquiry by curing any uncertainty in the mind of the defendant as to the nature of the conduct proscribed, Kotila, 114 S.W.3d at 249, the majority's conclusion that the intent requirement overcomes the vagueness challenge because it "makes certain what conduct is proscribed," ante, at 604, completely ignores the more important inquiry into whether the statute encourages arbitrary and discriminatory enforcement.

> Where ... there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure."

Papachristou, 405 U.S. at 170, 92 S.Ct. at 847 (emphasis added) (quoting Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940)). A statute "confers on police a virtually unrestrained power to arrest and charge persons with a violation [if it] ... fails to establish standards by which the officers may determine whether the suspect has complied" with its proscription. Kolender, 461 U.S. at 360–61, 103 S.Ct. at 1860 (emphasis added) (citations and quotations omitted).

The purpose of the second inquiry of the vagueness doctrine is to establish minimal guidelines to preclude subjective and discretionary enforcement by law enforcement officers. City of Chicago v. Morales, 527 U.S. 41, 61–62, 119 S.Ct. 1849, 1861–62, 144 L.Ed.2d 67 (1999). To hold that an intent requirement governing the conduct of the accused is a standard limiting the exercise of an arresting officer's discretion is pure sophistry, for the discretion is not exercised by the party upon whom the intent requirement is imposed. Holding that the intent requirement alone resolves the vagueness issue is especially disingenuous in light of the consistent holdings of this Court that the element of intent in a criminal case can be proven by mere inference from the prohibited conduct, itself. Stopher v. Commonwealth, 57 S.W.3d 787, 802 (Ky.2001) ("[I]ntent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct, and a person's state of mind may be inferred from actions preceding and following the charged offense."); Hudson v. Commonwealth, 979 S.W.2d 106, 110 (Ky.1998); Parker v. Commonwealth, 952 S.W.2d 209, 212 (Ky.1997). We have held that an inquiry into intent is "a subjective matter," Hudson, 979 S.W.2d

at 110, and that "neither the inference nor the presumption of intent [is] mandatory." *Id.* This standard requires no additional factual showing beyond the conduct from which the inference arises, a very low threshold indeed. Under the majority's construction, the statutory requirement of intent to manufacture methamphetamine may be inferred from mere possession of two or more of the chemicals or items of equipment necessary to do so.

Here, Appellant possessed Sudafed tablets, a gallon of drain cleaner, and three cans of starter fluid. Under the majority's construction of KRS 218A.1432(1)(b), the Commonwealth need prove nothing more to establish guilt. Although Appellant possessed a large quantity of Sudafed, one box would have sufficed under the majority's analysis. In fact, under that analysis, Appellant could have been convicted under KRS 218A.1432(1)(b) for possessing only the drain cleaner and the starter fluid. Because this threshold is so low, and the conduct from which intent may be inferred (possession of common household products) is so universal, the potential for arbitrary and discriminatory enforcement by law enforcement officers, prosecutors, or even juries is readily apparent. "[The void-for-vagueness doctrine] *requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact* in order to prevent 'arbitrary and discriminatory enforcement.'" *Goguen,* 415 U.S. at 572–73, 94 S.Ct. at 1247 (emphasis added). A criminal statute may not "permit a standardless sweep [that] allows *policemen, prosecutors, and juries* to pursue their personal predilections." *Id.* at 575, 94 S.Ct. at 1248 (emphasis added).

As for the chemicals prong of KRS 218A.1432(1)(b), possession of any two among ether (*e.g.,* starter fluid), sulfuric acid (*e.g.,* drain cleaner), salt, denatured alcohol (*e.g.,* camping fuel), methanol (*e.g.,* antifreeze), a lithium battery,[5] or antihistamine tablets, *Fulcher v. Commonwealth,* 149 S.W.3d 363, 368–69 (Ky.2004), accompanied by an inference of intent from such mere possession, is grounds for arrest and conviction under the majority's construction of the statute. Anyone who has ever driven a carbureted vehicle (often requiring starter fluid) while carrying a cell phone (likely powered by a lithium battery) possessed items sufficient to sustain probable cause for an arrest under this construction. Likewise, anyone who has ever gone camping (salt and camping fuel), or done mechanical work in an open garage (starter fluid, antifreeze, and/or driveway salt), has provided probable cause for an arrest.

If the chemicals are not common enough for concern, the majority's construction of KRS 218A.1432(1)(b) also permits arrest and conviction for possession of any two of the following items of "equipment" (creating, of course, the requisite inference of intent): coffee filters, cotton balls, a heat-resistant bowl (*e.g.,* Pyrex or Corningware), a non-metallic stirring tool, a glass jar, nearly any type of plastic vessel (*e.g.,* a gas container, plastic ketchup bottle, or dishwashing detergent bottle), a plastic funnel, plastic tubing or rubber hose, or pliers. *Fulcher,* 149 S.W.3d at 368–69. For the unimaginative, a few household functions that would satisfy possession of the two-or-more pieces of "equipment" requirement: operating a coffee maker (filters and a heat resistant coffee pot); maintaining a recycling bin (empty ketchup bottle and a glass jar); baking cookies (wooden spoon and plastic mixing bowl);

---

**5.** Lithium batteries may be used to power infinite household electronics, from laptop computers to camcorders to cell phones to DVD players. *See, e.g.,* http://www.zapworld.com.

cleaning an aquarium (rubber hosing and a plastic bucket); pickling vegetables (glass jar and a plastic funnel). "The statute does not require that the equipment was actually used to manufacture methamphetamine but only that it could be so used." *Varble v. Commonwealth,* 125 S.W.3d 246, 254 (Ky.2004).

Additionally, possession may be proven by circumstantial evidence. *Id.* (holding requirement of possession of precursor satisfied by defendant's possession of empty Sudafed "blister packs" and possession of anhydrous ammonia satisfied by odor of ammonia emanating from discolored air tank). *See also United States v. Morrison,* 207 F.3d 962, 966 (7th Cir.2000) (odor of ammonia in cooler and evidence of recent purchase of drain cleaner held sufficient). Presumably, a sales receipt showing the purchase of, *e.g.,* salt, a wooden spoon, or lithium batteries would suffice to prove both possession and intent.

Proponents of this construction would aptly respond that no one would *reasonably* infer intent from these aforementioned scenarios in which possession of two chemicals or items of equipment is present. However, the "arbitrary enforcement" prohibition of the vagueness doctrine is premised upon not only discouraging arbitrary convictions but also upon discouraging "arbitrary and erratic arrests," *Papachristou,* 405 U.S. at 162, 92 S.Ct. at 843, *i.e.,* wrongful subjection to the inconvenience or harassment of arrest, interrogation, and indictment based solely on the possession of two or more universally-owned household products. Perhaps no reasonable juror would convict on the basis of such evidence alone. But if the accused happens to be a convicted felon—of any felony—he or she faces the compounded dilemma of choosing whether to invoke the Fifth Amendment right against self-incrimination or explaining at trial an innocent reason for possession of two universally-owned household items with an equally innocent intent to use them for a purpose other than the manufacture of methamphetamine, but subjecting that testimony to impeachment by the introduction of evidence of the prior conviction. KRE 609(a). No doubt, a jury, however inappropriately, could infer intent from possession plus either (a) the defendant's failure to offer an innocent explanation, or (b) the defendant's status as a convicted felon.

Less than two years ago, we declared a provision of a no-smoking ordinance void for vagueness because it prohibited the presence of "ashtrays and other smoking paraphernalia" from no-smoking areas, without further defining "smoking paraphernalia." *Lexington Fayette County Food & Bev. Ass'n,* 131 S.W.3d at 753–56.

Unlike the enactments at issue in *Hoffman Estates* and *Posters 'N' Things, Inc.* [*v. U.S.,* 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994)], Section 14–99(3) gives no guidance beyond the words "smoking paraphernalia." Although it is likely a fair assumption that the ordinance is intended to require the covered entities to remove direct "smoking paraphernalia" such as cigarettes and cigars, but not breath mints and air freshener, "[l]ying between those extremes ... is a vast middle ground which is subject to characterization as lawful or unlawful in the discretion," [*Commonwealth* v.] *Foley, supra* [798 S.W.2d] at 950, of the enforcing authorities. Because the entities subject to the ordinance have no means to reasonably predict the scope of "smoking paraphernalia" that they must remove, Section 14–99(3) is void-for-vagueness.

*Id.* at 756. In *Hoffman Estates,* the ordinance required a business to obtain a li-

cense if it sold any items that were "designed or marketed for use with illegal cannabis or drugs," but was accompanied by "[a] series of licensing guidelines ... [that] define[d] 'Paper,' 'Roach Clips,' 'Pipes,' and 'Paraphernalia.'" 455 U.S. at 492, 102 S.Ct. at 1190. The Court found the ordinance "sufficiently clear," *id.* at 500, 102 S.Ct. at 1194, but noted that "[w]e agree with the Court of Appeals that a regulation of 'paraphernalia' alone would not provide much warning of the nature of the items regulated." *Id.* at 500 n. 17, 102 S.Ct. at 1194 n. 17. In *Posters 'N' Things,* the Court considered a challenge to the Mail Order Drug Paraphernalia Control Act, 21 U.S.C. § 857, which contained a lengthy definition of drug paraphernalia, 511 U.S. at 517 n. 6, 114 S.Ct. at 1750 n. 6, similar to that found in KRS 218A.500(1), which the Court found "establishe[d] objective standards for determining what constitutes drug paraphernalia." *Id.* at 518, 114 S.Ct. at 1750. Ironically, today's majority opinion cites only one case, *State v. Leeson,* 319 Mont. 1, 82 P.3d 16 (2003), in support of its holding that its construction of KRS 218A.1432(1)(b) does not render that statute void for vagueness. Yet, the statute construed in *Leeson* described in minute detail the chemicals and equipment the possession of which was proscribed:

> Section 45–9–131, MCA, defines some of the terms used in § 45–9–132, MCA (2001):
>
> (2) "Equipment" or "laboratory equipment" means all products, components, or materials of any kind when used, intended for use, or designed for use in the manufacture, preparation, production, compounding, conversion, or processing of a dangerous drug as defined in 50–32–101. Equipment or laboratory equipment includes but is not limited to:
>
> (a) a reaction vessel;

> (b) a separatory funnel or its equivalent;
>
> (c) a glass condensor;
>
> (d) an analytical balance or scale; or
>
> (e) a heating mantle or other heat source.
>
> (3) "Precursor to dangerous drugs" means any material, compound, mixture, or preparation that contains any combination of the items listed in 45–9–107(1), except as exempted by 45–9–108.

Section 45–9–107, MCA, provides a list of "precursors to dangerous drugs," a term used in both §§ 45–9–131 and –132, MCA (2001):

> (1) A person commits the offense of criminal possession of precursors to dangerous drugs if the person possesses any material, compound, mixture, or preparation that contains any combination of the following with intent to manufacture dangerous drugs:
>
> (a) phenyl–2–propanone (phenylacetone);
>
> (b) piperidine in conjunction with cyclohexanone;
>
> (c) ephedrine;
>
> (d) lead acetate;
>
> (e) methylamine;
>
> (f) methylformamide;
>
> (g) n-methylephedrine
>
> (h) phenylpropanolamine;
>
> (i) pseudoephedrine;
>
> (j) anhydrous ammonia;
>
> (k) hydriodic acid;
>
> (*l*) red phosphorus;
>
> (m) iodine in conjunction with ephedrine, pseudoephedrine, or red phosphorus;

(n) lithium in conjunction with anhydrous ammonia.

*Id.* at 18–19.

By contrast, KRS 218A.1432(1)(b) stands alone as the only statute in the United States criminalizing the possession of chemicals or equipment for the manufacture of methamphetamine without identifying the chemicals or equipment the possession of which would constitute criminal conduct. The closest statute to ours is Ark.Code Ann. § 5–64–403(c) which criminalizes the possession of *drug* paraphernalia with intent to use it in the manufacture of methamphetamine. However, "drug paraphernalia" is defined in detail in Ark. Code Ann. § 5–64–101; thus, the Arkansas scheme is more like KRS 218A.500 than KRS 218A.1432(1)(b). *Kotila* noted that there are at least three methods by which methamphetamine can be manufactured, each requiring possession of a different combination of chemicals or equipment, thus making identification of specific chemicals or equipment in the statute unwieldy if not impossible. 114 S.W.3d at 249. The only fact that saved KRS 218A.1432(1)(b) from being void for vagueness under the arbitrary or subjective enforcement inquiry was the statutory requirement that the defendant possess all of the chemicals or all of the equipment constituting the right combination necessary to manufacture methamphetamine. *Id.*

The majority opinion's construction of KRS 218A.1432(1)(b) also affects the double-jeopardy problem anticipated in dictum in *Kotila.* The Commonwealth argued in *Kotila* that the words "the chemicals or equipment" meant "any two or more chemicals or equipment," the construction now adopted by the new majority of this Court. We pointed out in *Kotila* that, under that construction, if one of the chemicals possessed by the defendant was anhydrous ammonia, evidence of the defendant's pos-session of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine would prove both that offense, as defined in KRS 250.489(1) and KRS 250.991(2), and manufacturing methamphetamine under KRS 218A.1432(1)(b). *Kotila,* 114 S.W.3d at 239. But if KRS 218A.1432(1)(b) required possession of anhydrous ammonia *and* all of the other chemicals necessary to manufacture methamphetamine, the latter requirement distinguished the two offenses, thus avoiding double jeopardy. *Id.* at 239–40. In retrospect, when viewed in light of the ramifications of today's majority opinion, that dictum is probably incorrect.

The defendant in *Kotila,* like Appellant Matheney, did not possess any quantity of anhydrous ammonia. However, because the expert witness in *Kotila* testified that anhydrous ammonia is a chemical necessary to manufacture methamphetamine by the ephedrine reduction ("Nazi") method, possession of anhydrous ammonia was a necessary element of the offense under the *Kotila* interpretation of KRS 218A.1432(1)(b), *i.e.,* "all of the chemicals" would necessarily include anhydrous ammonia. Likewise, "all of the chemicals" would necessarily include a methamphetamine precursor, such as the Sudafed tablets possessed by Appellant at the time of his arrest, possession of which is also proscribed by a separate statute, KRS 218A.1437, a Class D felony. Under the majority opinion's analysis, proof that a person possesses both a methamphetamine precursor and one additional but otherwise innocuous household product, *e.g.,* drain cleaner, would permit convictions of violating both KRS 218A.1437 and KRS 218A.1432(1)(b). Thus, the vagueness analysis with respect to arbitrary enforcement also implicates the double jeopardy analysis because, potentially, the police could arrest a defendant in his home on a

warrant for possession of a methamphetamine precursor with intent to manufacture methamphetamine, then, *e.g.*, "discover" a can of drain cleaner in plain view, and charge the defendant with violating both KRS 218A.1437 and KRS 218A.1432(1)(b), enhancing one offense from a Class D felony to two offenses, separate Class D and Class B felonies. If so, the double-jeopardy analysis in the *Kotila* dictum could not withstand constitutional scrutiny in the context of today's construction of KRS 218A.1432(1)(b) if one of the two or more chemicals used to convict of that offense is a methamphetamine precursor or anhydrous ammonia, because possession of either of those chemicals would be both a separate offense and a necessary element of the offense of manufacturing methamphetamine, thus a lesser included offense. KRS 505.020(2)(a).

Statutes so vague as to enable law enforcement officials to arrest on such broad or nebulous terms "bear[ ] the hallmark of a police state." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90–91, 86 S.Ct. 211, 213, 15 L.Ed.2d 176 (1965). "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government." *U.S. v. Reese*, 92 U.S. (2 Otto) 214, 221, 23 L.Ed. 563 (1875). In overruling *Kotila* and misconstruing KRS 218A.1432(1)(b), the majority does just that: sets a net large enough to catch or arrest virtually every citizen of the Commonwealth, premised solely upon the possession of two or more unenumerated, universally-owned household products and "leave[s] it to the courts to step inside and say who [may] rightfully be detained." The majority opinion's misconstruction of KRS 218A.1432(1)(b) renders the statute void for vagueness.

## IV. 2005 AMENDMENTS.

As noted by the majority opinion, the 2005 General Assembly amended KRS 218A.1432(1)(b) to read:

> (1) A person is guilty of manufacturing methamphetamine when he knowingly and unlawfully:
>
> . . . .
>
> (b) With intent to manufacture methamphetamine possesses two (2) or more items of equipment for the manufacture of methamphetamine.

2005 Ky. Acts, ch. 150, § 9. Thus, the present version of the statute now reads exactly the same as the majority opinion's interpretation of the previous version. However, the majority opinion fails to mention that the 2005 General Assembly also enacted a new section of KRS 218A.010 that reads:

> (14) "Intent to manufacture" means *any evidence which demonstrates a person's conscious objective* to manufacture a controlled substance or methamphetamine. Such evidence includes but is not limited to statements, a chemical substance's usage, quantity, manner of storage, or proximity to other chemical substances or equipment used to manufacture a controlled substance or methamphetamine.

2005 Ky. Acts, ch. 150, § 7(14) (emphasis added).

It is unnecessary to decide now whether the heightened evidentiary requirement for proof of intent to manufacture in new KRS 218A.010(14) overcomes the facial constitutional vagueness of the amended version of KRS 218A.1432(1)(b). Appellant was arrested and convicted under the previous statutory scheme which did not include the heightened evidentiary standard for proof of intent. Yet, the majority opinion today construes the previous version of KRS 218A.1432(1)(b) as having the same meaning as the amended version without the possible saving provision in

KRS 218A.010(14). Obviously, the General Assembly has recognized the constitutional infirmity of the amended version of KRS 218A.1432(1)(b), standing alone, and hopes that the enactment of new KRS 218A.010(14) will provide the cure.[6] The fact that the General Assembly did not enact a statute similar to KRS 218A.010(14) when it originally enacted KRS 218A.1432(1)(b) in 1998 indicates a different legislative intent then than now. Unfortunately, unlike the General Assembly, the majority of this Court, in addition to ignoring the doctrine of *stare decisis,* has failed to recognize that the 2005 version of KRS 218A.1432(1)(b), standing alone, is void for vagueness and has thereby interpreted the preexisting statutory scheme so as to render it unconstitutional.

Accordingly, I dissent.

---

6. Of course, if it is wrong and the amended version of KRS 218A.1432(1)(b) is subsequently declared void for vagueness under the arbitrary enforcement inquiry of that doctrine (KRS 218A.010(14) purports to address only the notice inquiry), the General Assembly will have succeeded in deleting altogether the "possession of chemicals or equipment" basis for a conviction of manufacturing methamphetamine.