RENDERED: MARCH 18, 2010
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## FINAL

### 2008-SC-000951-MR

DATE _09232010_

BILLY MASH             APPELLANT

APPEAL FROM MCCRACKEN CIRCUIT COURT
V.          HONORABLE R. JEFFREY HINES, JUDGE
NO. 08-CR-00179-004

COMMONWEALTH OF KENTUCKY           APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Appellant Billy Mash appeals his convictions in the McCracken Circuit Court for trafficking in cocaine and possession of drug paraphernalia. He challenges three decisions by the trial court admitting evidence and testimony against him. Finding no reversible error, we affirm.

## I. Background

Appellant's arrest and subsequent convictions were instigated by the tips of two incarcerated informants. The first informant, Brenda Taylor, was a drug dealer herself and had already provided police with information leading to another arrest. She informed police that Appellant had sold her cocaine on approximately fifty occasions in the past year, most recently, the previous week. The day after receiving Taylor's tip, a second informant, Olivia Dike, independently came forward with a corresponding tip. She told police that a

black male named "Billy" had sold her drugs approximately one hundred times. Although Dike knew Appellant only by his first name, she positively identified a photograph of him as the man who had sold her drugs. While the two corresponding tips were both offered by incarcerated women within a narrow timeframe, testimony at trial established that they were held in separate jail cells and did not know each other.

As part of a sting operation, the police asked Dike to call Appellant and place an order for cocaine to simulate an illegal drug transaction. Deputies from the police department taped the phone conversation in which the order was placed, and the prosecution played it for the jury at trial. The recording begins with Dike greeting "Billy" and asking him to bring her an "eight ball." During the phone conversation, Dike did not explain what she meant by an "eight ball," nor did Appellant ask what it was. Testimony at trial, however, revealed that an "eight ball" is slang for a 3.5 gram portion of cocaine. Appellant asked the caller who she was and Dike responded that she was "Olivia." He then asked where she was located and Dike simply responded that she was at her home. Appellant said he could be there in 30 to 40 minutes.

Two police detectives were charged with tracking the delivery. Detective David Knight immediately went to Appellant's home, where he reported a white Ford Ranger parked outside and identified Mash from a photograph he had been shown. Meanwhile, Detective Jesse Riddle headed to Dike's residence, where the transaction was agreed to take place. By the time Detective Riddle arrived at Dike's trailer park residence, there was already a white Ford Ranger moving toward Dike's trailer. Detective Riddle recognized the truck as

resembling the one Detective Knight reported outside Appellant's home and confirmed that the license plate matched as well. Detective Riddle was also able to identify Appellant from photographs he had seen.

When Appellant exited his truck and walked toward the trailer, Detective Riddle, without activating his blue lights, got out of his vehicle and identified himself. Appellant appeared nervous and stated he was there to see Dike. Detective Riddle asked Appellant if he had any weapons on him and Appellant responded that he did not. Detective Riddle did not have his handcuffs with him, but told Appellant to place his hands behind his back so Riddle could pat him down. During the pat down, Appellant tried to pull away, so Detective Riddle had to hold onto him to keep him still. In patting Appellant down, Riddle felt a large plastic baggie, along with an object that he perceived to be a wad of currency. He could not feel for certain what was in the plastic baggie, but later testified there was "a ninety-nine percent that it was going to contain cocaine based on the totality of the circumstances." Upon emptying Appellant's pockets, Riddle turned out to be correct. The baggie contained 2.9 grams of cocaine and in the same pocket was $2,250 in cash. There was an additional $380 in another pocket. Detective Riddle then arrested Appellant, read him his *Miranda* rights, and took him to jail.

A third officer, Detective Sergeant Matt Carter, interviewed Appellant in jail and then "Mirandized" him again before transporting him for further interviewing at the sheriff's office. Detective Carter testified that Appellant admitted to bringing the cocaine to Dike in exchange for sex. Police subsequently obtained a search warrant for Appellant's home and, based on

3

further information, got a second warrant to search Appellant's brother's residence. There, police found a safe containing over 57 grams of cocaine. Appellant admits this cocaine belonged to him but claimed it, along with the cocaine found earlier in his pocket, was for personal use. At trial, the Commonwealth introduced as evidence the large amount of cocaine found in the safe to prove that Appellant's intent was not personal use.

Appellant was convicted of trafficking in cocaine, subsequent offense, and possession of drug paraphernalia and sentenced to 20 years in prison. He now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

Appellant claims as error three decisions by the trial court to admit evidence and testimony against him. First, he argues that the cocaine and cash found in his pocket, along with all other fruits of that initial discovery, should have been suppressed under the exclusionary rule. Second, he contends that evidence of the cocaine from his brother's safe should not have been admitted, as it was proof of other bad acts. Third, he claims that allowing testimony on the legal definition of drug trafficking was reversible error.

### A. Items Found on Appellant

Prior to trial, Appellant moved to suppress the evidence obtained by Detective Riddle following his pat down, as well as all other fruits of that search. The trial court denied the motion and the evidence was admitted at trial.

Appellant claims the evidence should have been suppressed under the exclusionary rule. Of course, the exclusionary rule only applies if the initial

4

search was unconstitutional under the Fourth Amendment, as incorporated by the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961). This Court's inquiry, therefore, must focus on whether Detective Riddle's warrantless pat down of Appellant, and his emptying Appellant's pockets, complied with the Fourth Amendment to the U.S. Constitution. The Commonwealth contends that it was a legitimate search incident to a lawful arrest, with which this Court agrees.

While "[g]enerally, the police may not search an individual without a warrant, . . . one of the recognized exceptions to the rule . . . [is] a search incident to an arrest." *Stewart v. Commonwealth*, 44 S.W.3d 736, 379 (Ky. 2000). The question, therefore, becomes whether Appellant was lawfully arrested.

Appellant's arrest was authorized by Kentucky law. Kentucky has long followed the rule that a warrantless arrest for a felony is authorized if there are "reasonable grounds for making the arrest." *Williams v. Commonwealth*, 147 S.W.3d 1, 6 (Ky. 2004). This rule is codified in KRS 431.005(1)(c): "A peace officer may make an arrest . . . without a warrant when he has probable cause to believe that the person being arrested has committed a felony."

Kentucky's probable cause standard is entirely consistent with constitutional strictures. "A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). In evaluating probable cause, a court must look at "the totality of the circumstances." *Id.*

The circumstances in this case included the corresponding tips from two informants, the revealing phone conversation, and Appellant's behavior in conformity with that conversation. In determining whether informants' tips equate to probable cause, the key inquiry is into the "relative indicia of reliability accompanying [them]." *Lovett v. Commonwealth*, 103 S.W.3d 72, 78 (Ky. 2003). As we stated in *Williams*, "[A]n informant's tip predicting future behavior, which is then corroborated by observations of the investigating officers, can result in a finding of probable cause." 147 S.W.3d at 8 (citing *Illinois v. Gates*, 462 U.S. 213, 243-46 (1983)). In *Williams*, the informant's correct descriptions of the suspect and predictions of his future actions provided "sufficient objective indicia of reliability." 147 S.W.3d at 6. Moreover, tips from known informants are entitled to more weight than those from anonymous sources. *Lovett*, 103 S.W.3d at 78.

In this case, the tips, coming as they did from known informants, contained "sufficient objective indicia of reliability." The corresponding nature of the tips from two separate informants, that Appellant had engaged in many cocaine transactions with each of them, served to verify one another's tip. Furthermore, Taylor had already demonstrated her reliability by contributing information to a previous arrest. Most importantly, Dike's claim to have regularly bought cocaine from Appellant was strongly corroborated by their revealing telephone conversation. Through that conversation, Appellant confirmed, albeit tacitly, that he (1) was familiar with the informant on a first-name basis, (2) knew where the informant lived, (3) knew what an "eight ball" was, and (4) was readily able and willing to deliver an "eight ball" to her. Dike's

account of frequent transactions with Appellant was further endorsed by Appellant's quick arrival at her trailer and his admission to Detective Riddle that he was there to see "Olivia." The police had sufficient confirmation to rely on the two informants.

Based on the corresponding tips from two independent informants accompanied by the inferences reasonably drawn from Appellant's phone conversation and subsequent appearance at Dike's trailer, Detective Riddle had probable cause to believe Appellant had committed a felony. Specifically, the evidence all pointed the police department and Detective Riddle to the conclusion that Appellant had committed (or was in the process of committing) drug trafficking. Thus, there was probable cause to arrest Appellant.

As Detective Riddle had the legal and constitutional authority to arrest Appellant, it follows that his search of Appellant's pockets was a legitimate search incident to arrest. While Appellant insists that a search incident to a lawful arrest must logically occur after the arrest, he admits his position is contrary to the rulings of both this Court and the United States Supreme Court. *See Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *Williams*, 147 S.W.3d 1, 9. It is immaterial whether police choose to search immediately after or prior to arresting a suspect. *See Rawlings*, 448 U.S. at 111; *Williams*, 147 S.W.3d at 9. "A warrantless search preceding arrest is reasonable under the Fourth Amendment so long as probable cause to arrest existed before the search, and the arrest and the search were substantially contemporaneous." *Williams*, 147 S.W.3d at 8.

The case at hand satisfies both requirements. As discussed above, Detective Riddle had probable cause to arrest Appellant before the search. Also, the search and arrest were virtually contemporaneous–as soon as Detective Riddle discovered the money and cocaine and completed his search, he arrested Appellant, read him his *Miranda* rights, and took him to jail. As Detective Riddle performed a search incident to a lawful arrest, the exclusionary rule is not triggered and thus, the trial court properly denied Appellant's motion to suppress.

## B. Evidence of Additional Cocaine

Appellant next contends that the 57 grams of cocaine found in his brother's safe, which Appellant admits belonged to him, was improperly admitted at trial. He moved prior to trial to exclude the evidence, but the trial court denied his motion.

Evidentiary rulings at trial are reviewed for abuse of discretion. *See, e.g., Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky. 1998). This Court's inquiry is, therefore, limited to whether the trial court abused its discretion in allowing evidence of the cocaine from the safe. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." KRE 404(b). However, the same evidence may be admissible if offered for another, legitimate purpose. KRE 404(b)(1). It is uncontested that the cocaine found in the safe was relevant for another such purpose—namely, intent.

The main issue at trial was whether Appellant possessed the cocaine for personal use (as he maintained) or, instead, to sell or distribute, within the

8

scope of drug trafficking set forth in KRS 218A.010(40) (as the Commonwealth argued). Thus, his intent as to the cocaine was at issue. The Commonwealth introduced the high volume of additional cocaine belonging to Appellant to infer that his intent was not to use the cocaine for personal use, but rather for trafficking.[1] Such an inference is legitimate when the amount of cocaine is large. *Parker v. Commonwealth*, 291 S.W.3d 647, 674 (Ky. 2009); *see also United States v. Faymore*, 736 F.2d 328, 333 (6th Cir. 1984) ("intent to distribute can be inferred by the jury from circumstantial evidence of possession of large quantities"). Thus, Appellant's 57 grams of cocaine in his brother's safe, being a large quantity, was relevant to the Commonwealth's charge of drug trafficking. The additional cocaine met the KRE(404)(b)(1) "intent" exception.

Nonetheless, Appellant complains that the evidence should have been excluded due to its high degree of potential prejudice. Appellant is correct that evidence is not automatically admissible simply because it falls into one of the exceptions listed in KRE 404(b)(1). In addition to satisfying a KRE 404(b) exception, "evidence of criminal conduct other than that being tried is admissible . . . only if its probative value on that issue outweighs the unfair prejudice with respect to character." *Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992); *see also* KRE 403. In this instance, the resulting undue prejudice is minimal.

---

[1] The indictment in this case charged Appellant only with trafficking the 2.9 grams of cocaine Detective Riddle found in his pocket. The record does not indicate whether Appellant was separately charged and indicted for a crime related to the 57 grams of cocaine found in the safe.

While Appellant cites *Billings v. Commonwealth,* 843 S.W.2d 890 (Ky. 1992), and *Bell v. Commonwealth,* 875 S.W.2d 882, 890 (Ky. 1994), for the proposition that evidence of other crimes is always highly prejudicial to a defendant, such a reading is overbroad. Both cases note the higher danger of prejudice from such evidence, but the particular form of prejudice at issue in those two cases is wholly absent here. In both of the cases relied on by Appellant, the Court feared the introduction of other criminal acts would unfairly imply that the defendants had acted in conformity with those acts. *See Billings,* 843 S.W.2d at 894; *Bell,* 875 S.W.2d at 890. *Billings* and *Bell* were both sodomy trials, where the trial courts admitted evidence of remote criminal sexual acts by the defendants. *See Billings,* 843 S.W.2d at 892; *Bell,* 875 S.W.2d at 888. In both cases it was unduly prejudicial to imply that, because the defendant had committed other criminal acts, he must have committed the similar acts in question.

Distinct from *Billings* and *Bell,* Appellant's possession of cocaine in his brother's safe was not used to imply he engaged in any other acts. In fact, how Appellant *acted* was uncontested at trial. He conceded that he possessed the cocaine on his body. The factual issue at trial was one of intent, not behavior: Why did he possess the cocaine? Was it for personal use or was it for trafficking? Thus, the cocaine found in the safe did not unduly imply conforming behavior.

Additionally, the "other act" in this case was contemporaneous with the charged crime, whereas the "other crimes" in *Billings* and *Bell* were removed in

10

time. Their remoteness lent more credence to the idea that they were offered merely to suggest the defendants' criminal dispositions.

Ultimately, any unfair prejudice that might have resulted in this case was outweighed by the probative value of the evidence. Appellant complains that the evidence of 57 grams of cocaine might have led to a harsher sentence than if the jury had only been aware of the 2.9 grams found in his pocket. He analogizes this impact to the effect of describing multiple dead bodies in a single murder trial. It is hard to imagine, however, that additional grams of cocaine would play on a jury's emotions in the same way as additional deaths (or additional prior sex crimes, as in *Billings* and *Bell*). In any event, the probative value of the 57 grams of cocaine is far too great to be outweighed by other factors. It was critical to the central issue at trial: whether or not the cocaine was intended for personal use.

### C. Testimony on Definition of Trafficking

Appellant's final argument is that permitting Detective Sergeant Carter to testify to the legal definition of trafficking constituted reversible error. On direct examination, the prosecution asked Detective Carter what constituted "trafficking." Appellant objected, noting that it was the trial court's duty to instruct the jury on the law. Apparently misinterpreting the objection, the court told the prosecutor to lay a sufficient foundation for the testimony. The prosecutor went on to ask Detective Carter if he was familiar with the trafficking statute, and the detective responded that he was. The prosecutor then asked what two ways one can be guilty of drug trafficking. Detective Carter replied, "When you actually sell or transfer [a narcotic], or [possess] with

11

the intent to sell or transfer a narcotic to someone, that constitutes the elements of trafficking."

Contrary to Detective Carter's testimony, possession with the intent to transfer does not fall within the definition of trafficking pronounced in KRS 218A.010(40). "Traffic" is defined as "to manufacture, distribute, dispense, sell, transfer, or possess with intent to manufacture, distribute, dispense, or sell a controlled substance." "Noticeably absent from this statutory definition" is "[possess] with the intent to . . . transfer," the language used by Detective Carter. *Commonwealth v. Rodefer*, 189 S.W.3d 550, 552 (Ky. 2006). Detective Carter announced an additional form of liability—possession with intent to transfer—on which the jury was not permitted to convict.

Detective Carter's testimony was inadmissible. While KRE 702 permits expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue," it does not permit a witness to aid in the determination of a legal issue. *See Gibson v. Crawford*, 259 Ky. 708, 83 S.W.2d 1, 7 (1935) ("The courts never allow a witness to give his conclusion on questions of law. . . ."); *Foster v. Commonwealth*, 827 S.W.2d 670, 678 (Ky. 1991) (upholding trial court's "refus[al] to reopen the case so that Foster's expert could testify on the definition of extreme emotional disturbance"). Since it is not the jury's role to determine what the law is, such aid would be unhelpful. It is well-recognized that the judge is charged with determining the law and, in turn, instructing the jury on its application to the case. *See United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984) ("Expert testimony on the law is excluded because the trial judge does not need the judgment of

12

witnesses. . . . The special legal knowledge of the judge makes the witnesses' testimony superfluous. It is the function of the trial judge to determine the law of the case. It is impermissible to delegate that function to a jury through the admission of testimony on controlling legal principles."). Simply put, it is error to allow a witness, expert or otherwise, to testify as to the content of the law. In this case, the error was compounded by Detective Carter making not merely an improper statement of law, but an improper *mis*statement of law.

The Commonwealth seeks to avoid any finding of error by arguing that Appellant did not properly preserve this matter for appellate review. The Commonwealth attacks the adequacy of Appellant's objection at trial, stating, "Appellant did *not* object on the basis the detective was not an expert or had specialized knowledge. He objected on the basis that only the trial court could talk about what trafficking meant." (Emphasis in original.) In fact, it is the Commonwealth that has confused the issue: as discussed above, the problem with Detective Carter's testimony was not his lack of expertise, but the inappropriate subject matter of his testimony. As the Commonwealth admits, Appellant's objection was that only the trial court could instruct the jury as to the law of trafficking. That the trial court's reaction to the objection was non-responsive (and that the defense did not further object) does not make the initial objection ineffective for purposes of preservation.

Having found the trial court to be in error, and the error to be preserved, the question before this Court is whether that error was harmless. *See* RCr 9.24. "A non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not

13

substantially swayed by the error." *Winstead v. Commonwealth,* 283 S.W.3d 678, 688-89 (Ky. 2009) (citing *Kotteakos v. United States,* 328 U.S. 750, 765 (1946)). "But '[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or one is left in grave doubt, the conviction cannot stand.'" *Crossland,* 291 S.W.3d 223, 233 (Ky. 2009) (quoting *Kotteakos,* 328 U.S. at 765) (alteration in original). Only if Appellant's conviction was substantially swayed by the detective's "misstatement of law," should his conviction be reversed.

In ascertaining the influence of Detective Carter's testimony on Appellant's conviction, this Court must attempt to uncover the reasoning behind the verdict. The factual inquiry posed to the jury in the present case was a relatively narrow one: Why did Appellant bring 2.9 grams of cocaine to Olivia Dike's trailer? There were two competing explanations presented at trial. The Commonwealth relied on Detective Carter's testimony that Appellant had admitted he planned on exchanging the cocaine for sex. On the other hand, Appellant testified, and the defense maintained, that he had no intention of giving the cocaine to Dike at all; he was merely carrying it for his own, personal use. The jury was asked to pick one of the two.

Regardless of Detective Carter's unfortunate, supplemental legal opinion, it seems clear that the jury chose the Commonwealth's version. If the jury had believed Appellant's trial testimony, that the cocaine was for personal use, it would not have convicted Appellant, even under Detective Carter's erroneous, somewhat broader definition of trafficking. Following Appellant's story, the jury

14

could not have concluded he had the intent to sell, distribute, or even *transfer* the cocaine.[2] The jury could not consistently believe that Appellant planned to keep the cocaine for himself, while having the intent to transfer it to someone else. Thus, even in the event that the jury utilized Detective Carter's definition,[3] if it believed Appellant, it would have acquitted him of trafficking. Since the jury did not acquit, it could not logically have believed Appellant's story.

By process of elimination then, this Court deduces that the jury agreed with the Commonwealth that Appellant intended to trade cocaine for sex. Such an exchange clearly falls within the meaning of "sell" as defined in the jury instructions: "to dispose of a controlled substance to another person for payment or *other consideration.*" (Emphasis added).[4] It also fits the substantially similar statutory language: "to dispose of a controlled substance to another person for consideration. . . ." KRS 218A.010(36). The jury likely found that Appellant intended to dispose of the cocaine to Olivia Dike in exchange for "other consideration." The improper admission of Detective

---

[2] The court only instructed the jury on liability through possession with the intent of selling or distributing. While liability can also arise through the intent to manufacture or dispense, no testimony or instruction was given regarding these forms of liability, so there is no reason they would have formed the basis of the verdict.

[3] It is unlikely that the jury followed Detective Carter's definition anyway. The judge's instructions correctly left out "intent to transfer" as a form of liability. "[A] jury is presumed to follow a trial court's instructions. . . ." *Dixon v. Commonwealth,* 263 S.W.3d 583, 593 (Ky. 2008) (citing *Matheny v. Commonwealth,* 191 S.W.3d 599, 606 (Ky. 2006)).

[4] Mash's intention may also qualify as "to distribute." KRS 218A.010(10) broadly defines distribute as "to deliver other than by administering or dispensing a controlled substance." However, the precise meaning of "distribute" is partially clouded after our ruling in *Rodefer,* 189 S.W.3d at 553.

15

Carter's legal opinion did not sway the verdict and was, therefore, harmless error.

## IV. Conclusion

For the foregoing reasons, the judgment of the McCracken Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

V. Gene Lewter
Department of Public Advocacy
100 Fair Oaks Lane
Suite 302
Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

James Coleman Shackelford
Assistant Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Suite 200
Frankfort, Kentucky 40601-8204